FOURT, J.
 

 is an unfair competition action brought by Futureeraft Corporation (hereinafter referred to as Futureeraft) for an injunction, damages and an accounting against a former employee, Roderick Koutnik (hereinafter referred to as Koutnik) and Koutnik’s new employer, Clary Corporation (hereinafter referred to as Clary), for the wrongful use and disclosure of certain valve designs claimed to be confidential to and the trade secrets of Futureeraft. Future-craft appeals from a judgment in favor of both defendants entered by the court below after a trial limited by that court to the following issue: “What, if any, trade secret, embraced within the issues as established by the pleadings, stipulations and pretrial order,
 
 became entrusted to the defendant Roderick Koutnik while he was an employee of the plaintiff?”
 
 (Emphasis added.)
 

 The trial of the matter was protracted, extending over a period of 14 weeks, and the reporter’s transcript of the proceeding is over 5,200 pages.
 

 On February 23, 1960, the trial judge filed his notice (i.e., memorandum) of decision.1 The findings of fact and conclusions of law,2 and judgment,3 were filed August 8, 1960.
 

 Before making any reference to the facts it will be helpful to bring the problems presented into sharp focus. Plaintiff’s case does
 
 not
 
 involve a claim of a trade secret alleged to exist in the know-how; nor the process under which the valves were made; nor any machine; nor the tools used in the process of manufacture of the valve. This is not a know-how case or a case arising out of alleged trade secrets which underlie the manufacture of the valves in issue. Nor does plaintiff complain of any improper disclosure by Koutnik of assertedly confidential information while he was in the employ of plaintiff. The basis of plaintiff’s claim for relief is, as set forth in the opening brief, “(1) that the various
 
 design features
 
 are proteetible trade secrets, as such, and (2) that, at any rate, Kontnik had expressly agreed that he would not utilize these designs (and particularly the paragraph V design) in competition with Futureeraft.” (Emphasis added.)
 

 
 *282
 
 , Futurecraft and Clary are,, and since at least 1953 or early 1954 have been,, competitors in the design, manufacture and sale of valves and valve components for guided missiles and rockets for the defense program of the United States. Koutnik was employed by Futurecraft during three separate periods (part-time from 1949 to 1951, and full-time from July 1, 1951, to April 25, 1952, and from January 31, 1953, to March 17,1956) for the purpose of inventing, designing and develop7 ing such valves and valve components.
 

 Koutnik had been employed by the California Institute of Technology at its Jet Propulsion Laboratory from September 15,1947, to May 11, 1951, and from April 28,1952, to January 25,1953.
 

 The trial court stated in his memorandum of decision (foot-note 1, par. IX) that when Koutnik entered the employ of Futurecraft, “he carried with him a good deal of knowledge concerning the art, science and mechanics of valve design and manufacture, and a good deal of skill in the application of that knowledge . . . [and that] [m]uch, probably most, of that knowledge had been acquired at the Jet Propulsion Laboratory of the California Institute of Technology.....” (See finding 2, footnote 2.)
 

 The particular valve designs forming the subject matter of this action are described in paragraphs V, VI, VII and IX of the first amended and supplemental complaint as amended. Essentially these consist of two types of valve mechanisms. The. so-called paragraph V valve is a high-pressure valve mechanism embodying an arrangement of resilient entrapped O-rings, annular shoulders and stop means. It is used in the propellant system of rockets and guided missiles. The paragraph IX valve is an adjustable pressure regulator valve in combination with a pressure relief valve. The paragraphs VI and VII mechanisms are modifications of the basic paragraph V valve. Plaintiff had filed patent applications on certain features of its paragraph V and IX valves, both of which applications were still pending at the time judgment was entered below.
 
 [4]
 
 The information alleged by Futurecraft to be confidential to it consists of a number of specific design féatures of the respective valves.
 

 It was stipulated that the valves which are the subject .of the action are sold by plaintiff to rocket and missile contractors and subcontractors of the United States government
 
 *283
 
 for use in, or in conjunction with, rockets, missiles and airplanes and/or components thereof, and that the government has been the ultimate purchaser of these items.
 

 All of the parties to this action have presented scholarly-dissertations on the law of trade secrets—what a trade secret is and the tests which should be utilized to ascertain whether a trade secret exists.
 

 It is appropriately- stated in appellant’s opening brief:
 

 “. . . this Court will be presented with two basically' divergent approaches, or viewpoints, on this definitional problem. The defendants successfully urged the trial court to adopt a rigidly narrow and absolutist view, based upon a concept that a trade secret must be ‘an item of private property’ and that one can have no ‘property rights’ in an idea if someone else—anyone else—knows about it.
 

 “In contrast to defendants’ property rights concept, plaintiff urged below and urges here a more realistic, equitable and common sense approach (which is widely accepted and applied in other jurisdictions), based upon the Restatement view that a trade secret may consist of anything which is ‘. . . used in one’s business, and which gives him an opportunity to obtain an advantage over
 
 competitors who do not know or use it . .
 
 .’ (Emphasis added.) Rest., Torts, § 757, Comment b.”
 

 Before turning to the “definitional problem” of what constitutes a trade secret, it is well to mention a basic underlying problem, namely, the legal basis upon which plaintiff predicates its right to relief. This problem stems from the fact that ownership of a trade secret does not give the owner a monopoly in its use, but merely a proprietary right which equity protects against usurpation by unfair means. (See
 
 Wexler
 
 v.
 
 Greenberg,
 
 399 Pa. 569 [160 A.2d 430]; 1 Nims, Unfair Competition and Trade-Marks (4th ed. 1947) § 141 et seq.; 2 Callman, Unfair Competition and Trade-Marks (2d ed. 1950) §51 et seq.; Ellis, Trade Secrets (1953) § 1. See also Restatement, Torts, § 757, com. (a).) It is stated by Justice Musmanno in
 
 Spring Steels, Inc.
 
 v.
 
 Molloy,
 
 400 Pa. 354 [162 A.2d 370, 374] quoting from
 
 Wexler
 
 v.
 
 Greenberg, supra,
 
 160 A.2d 430, 434, that:
 

 “ ‘. . . The employer thus has the burden of showing two things: (1) a legally protectable trade secret;
 
 and
 
 (2)
 
 a legal basis,
 
 either a covenant or a confidential relationship,
 
 upon which to predicate relief.’ ”
 
 (Emphasis added.)
 

 The case of
 
 Wexler
 
 v.
 
 Greenberg, supra,
 
 160 A.2d 430, deals primarily with the “legal basis . . . upon which to predicate
 
 *284
 
 relief” problem. In many respects the
 
 Wexler
 
 case aptly illustrates the situation presented in the case at bar.
 

 In
 
 Wexler,
 
 defendant Greenberg was a qualified chemist in the sanitation and maintenance field. In March of 1949 he was employed by plaintiff as its chief chemist and continued there for approximately eight years. In the performance of his duties he spent approximately half of his working time in plaintiff’s laboratory where he would analyze and duplicate competitor’s products and then use the resulting information to develop various new formulas. In August 1957 defendant Greenberg left plaintiff and went to work for defendant corporation. Plaintiff sought to enjoin the defendants from disclosing and using certain formulas and processes pertaining to the manufacture of certain sanitation and maintenance chemicals which plaintiff claimed to be its trade secrets. The Chancellor found that the formulas constituted trade secrets and that their appropriation was in violation of the duty that Greenberg owed to plaintiff by virtue of his employment and the trust reposed in him.
 

 The Supreme Court of Pennsylvania assumed that certain of the formulas were trade secrets of the plaintiff but reversed and stated in pertinent part as follows:
 

 “ [2] We are initially concerned with the fact that the final formulations claimed to be trade secrets were not
 
 disclosed to
 
 Greenberg by the appellees during his service or because of his position. [Italics shown.] Rather, the fact is that these formulas had been developed by Greenberg himself, while in the pursuit of his duties as Buckingham’s [i.e., plaintiff] chief chemist, or under Greenberg’s direct supervision. We are thus faced with the problem of determining the extent to which a former employer,
 
 without the aid of any express covenant
 
 [italics shown], can restrict his ex-employee, a highly skilled chemist, in the uses to which this employee can put his knowledge of formulas and methods he himself developed during the course of his former employment because this employer claims these same formulas, as against the rest of the world, as his trade secrets.
 
 This problem, becomes particularly significant when one recognizes that Greenberg’s situation is not uncommon. In this era of electronic, chemical, missile and atomic development, many shilled technicians and expert employees are currently in the process of developing potential trade secrets. Competition for personnel of this caliber is exceptionally keen, and the interchange of employment is commonplace.
 
 One has but to reach for his daily newspaper
 
 *285
 
 to appreciate the current market for such skilled employees.
 
 We must therefore be particularly mindful of any effect our decision in this case might have in disrupting this pattern of employee mobility, both in view of possible restraints upon an individual in the pursuit of his livelihood and the harm to the public in general in forestalling to any extent widespread technological
 
 advances.” (P. 433.) (Emphasis added.)
 

 The court, after noting the fact that there was no covenant between Buckingham and Greenberg and, as indicated above, having assumed that some of the formulas were trade secrets of Buckingham, stated:
 

 “. . . The sole issue for us to decide, therefore, is whether or not a confidential relationship existed between Greenberg and Buckingham binding Greenberg to a duty of nondisclosure.
 

 “The usual situation involving misappropriation of trade secrets in violation of a confidential relationship is one in which an employer
 
 discloses to his employee
 
 a pre-existing trade secret (one already developed or formulated) so that the employee may duly perform his work. [Italics shown.] [Footnote reference to the following citations:
 
 Morgan’s Home Equipment Corp.
 
 v.
 
 Martucci
 
 (1957) 390 Pa. 618 [136 A.2d 838];
 
 MacBeth-Evans Glass Co.
 
 v.
 
 Schnelbach
 
 (1913) 239 Pa. 76 [86 A. 688]. Cf.
 
 Pittsburgh Cut Wire Co.
 
 v.
 
 Sufrin
 
 (1944) 350 Pa. 31 [38 A.2d 33];
 
 Belmont Laboratories
 
 v.
 
 Heist
 
 (1930) 300 Pa. 542 [151 A. 15];
 
 Pressed Steel Car Co.
 
 v.
 
 Standard Steel Car Co.
 
 (1904) 210 Pa. 464 [60 A. 4];
 
 Witherow Steel Corp.
 
 v.
 
 Donner Steel Co.
 
 (D.C.W.D.N.Y. 1929) 31 F.2d 157;
 
 Philadelphia Extracting Co.
 
 v.
 
 Keystone Extracting Co.
 
 (C.C.E.D. Pa. 1910) 176 F. 830;
 
 Junker
 
 v.
 
 Plummer
 
 (1946) 320 Mass. 76 [67 N.E.2d 667, 167 A.L.R. 1449];
 
 Aronson
 
 v.
 
 Orlov
 
 (1917) 228 Mass. 1 [116 N.E. 951];
 
 Cincinnati Bell Foundry
 
 v.
 
 Dodds
 
 (1887) 10 Ohio Dec. Reprint 154;
 
 Colonial Laundries
 
 v.
 
 Henry
 
 (1927) 48 R.I. 332 [138 A. 47, 54 A.L.R. 343]; cases collected in Annotation, 165 A.L.R. 1453;
 
 Sun Dial Corporation
 
 v.
 
 Rideout
 
 (1954) 29 N.J. Super. 361 [102 A.2d 90];
 
 Franke
 
 v.
 
 Wiltschek
 
 (2 Cir. 1953) 209 F.2d 493;
 
 Smith
 
 v.
 
 Dravo Corp.
 
 (7 Cir. 1953) 203 F.2d 369.] In such a case the trust and confidence upon which legal relief is predicated stems from the instance of the employer’s
 
 turning over to the employee
 
 the pre-existing trade secret. [Italics shown.] It is then that a pledge of secrecy is impliedly extracted from the employee, a pledge which he ' carries with him even beyond the ties of his employment
 
 *286
 
 relationship. Since it is conceptually impossible, however, to elicit an implied pledge of secrecy from the sole act of an employee turning over to his employer a trade secret which he, the employee, has developed, as occurred in the present ease, the appellees must show a different manner in which the present circumstances support the permanent cloak of confidence cast upon Greenberg by the Chancellor. The only avenue open to the appellees is to show that the nature of the employment relationship itself gave rise to a duty of nondisclosure.
 

 “The burden the appellees must thus meet brings to the fore a problem of accommodating competing policies in our law: the right of a businessman to be protected against unfair competition stemming from the usurpation of his trade secrets and the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he is best suited. There are cogent socio-economic arguments in favor of either position. Society as a whole greatly benefits from technological improvements. Without some means of post-employment protection to assure that valuable developments or improvements are exclusively those of the employer, the businessman could not afford to subsidize research or improve current methods. In' addition, it must be recognized that modern economic growth and development has pushed the business venture beyond the size of the one-man firm, forcing the businessman to a much greater degree to entrust confidential business information relating to technological development to appropriate employees. While recognizing the utility in the dispersion of responsibilities in larger firms, the optimum amount of ‘entrusting’ will not occur unless the risk of loss to the businessman through a breach of trust can be held to a minimum.
 

 ‘ ‘ On the other hand, any form of post-employment restraint reduces the economic mobility of employees and limits their personal freedom to pursue a preferred course of livelihood. The employee’s bargaining position is weakened because he is potentially shackled by the acquisition of alleged trade secrets; and thus, paradoxically, he is restrained, because of his increased expertise, from advancing further in the industry in which he Is most productive. Moreover, as previously mentioned, society suffers because competition is diminished by slackening the dissemination of ideas, processes and methods.” (Pp. 434-435.)
 

 The court then discussed
 
 Extrin Foods, Inc.
 
 v.
 
 Leighton,
 
 
 *287
 
 202 Misc. 592 [115 N.Y.S.2d 429] and
 
 Wireless Specialty Apparatus Co.
 
 v.
 
 Mica Condenser Co., Ltd.,
 
 239 Mass. 158 [131 N.E. 307, 16 A.L.R 1170], as illustrations of the .kind of employment relationships in which a court will find that' a confidential relationship exists at pages 435-436:
 

 . . In
 
 Extrin Foods, Inc.
 
 v.
 
 Leighton
 
 (1952) 202 Misc. 592 [115 N.Y.S.2d 429].... The employee therein, a chemist, was assigned a specific task for which he was given valuable leading information, including pre-existing trade secrets, careful supervision and license to enter into research and experimentation so as to attain the theretofore unobtainable goal which Extrin had been seeking. A similar situation may be found in
 
 Wireless Specialty Apparatus Co.
 
 v.
 
 Mica Condenser Co., Ltd.
 
 (1921) 239 Mass. 158 [131 N.E. 307, 16 A.L.R 1170], where defendant engineers were enjoined from disclosing trade secrets they had developed by the Wireless company. There, the company, in order to remain in business after the close of the war, had assigned its six engineers, including the defendants, to the specific research project of developing a method of manufacturing magneto condensers (the trade secret in issue) and had committed them to six months of extensive research and experimentation solely towards this end under the general supervision of its chief engineer.”
 

 The court concluded that Greenberg was privileged to disclose and use the formulas which he had developed—they being a part of the technical knowledge and skill that he had acquired by virtue of his employment (p. 437). Therefore, even though the formulas were plaintiff’s trade secrets, Green-berg was privileged to use them.
 

 It is apparent that the trial judge in the case at bar did give careful consideration to the “legal basis . . . upon which to predicate relief” problem even though he ultimately held that there was no trade secret. This is evident from the trial court’s framing of the issue to be: “What, if any, trade secret . . . became entrusted to the defendant Roderick Koutnik while he was an employee of the plaintiff” and by what was stated in paragraph IX of the notice of decision. (See also findings of fact 1 and 2, footnote 2.)
 

 Appellant asserts in its reply brief that the fact that Koutnik utilized knowledge and skill which he obtained at Jet Propulsion Laboratory in developing the Paragraph Y valve design is immaterial. While it might well be immaterial on the “definitional problem” of what constitutes a trade secret, it is material on the “legal basis . . . upon which to predicate
 
 *288
 
 relief” phase of the problem. In other words, as illustrated by the
 
 Wexler
 
 case,
 
 supra,
 
 plaintiff may well have a trade secret yet defendant Koutnik be privileged to use it by virtue of there being no covenant or breach of confidence.
 

 A basis for the protection of trade secrets is that the recipient obtains through a confidential relationship something he did not previously know. (See
 
 E. I. Du Pont De Nemours Powder Co.
 
 v.
 
 Masland,
 
 244 U.S. 100 [37 S.Ct. 575, 61 L.Ed. 1016];
 
 Larson
 
 v.
 
 General Motors Corp.,
 
 52 P.Q. 450, 454, S.D.N.Y. (1941), 58 P.Q. 593, S.D.N.Y. (1943);
 
 De Filippis
 
 v.
 
 Chrysler Corp.,
 
 159 F.2d 478; Ellis, Trade Secrets, § 18.)
 

 In the
 
 Wexler
 
 case, the defendants were using the very same formulas which Greenberg had developed yet the court held that Greenberg was privileged. (See paragraphs 3, 4 and 5 of paragraph VII of the notice of decision, footnote 1.)
 

 The court cannot compel a man who changes employers to wipe clean the slate of his memory.
 
 (Sarhes Tarzian, Inc.
 
 v.
 
 Audio Devices, Inc.,
 
 166 F. Supp. 250;
 
 Avocado Sales Co.
 
 v.
 
 Wyse,
 
 122 Cal.App. 627, 634 [10 P.2d 485].) To grant plaintiff the relief prayed for would in effect restrain Koutnik from the pursuit of his profession. He would be deprived of the use of knowledge and skill which he gained which did not originate with plaintiff. (See
 
 Levine
 
 v.
 
 E. A. Johnson & Co.,
 
 107 Cal.App.2d 322 [237 P.2d 309].) If the foregoing is not soundly premised how could a former employee with Koutnik’s knowledge and skill obtain future employment?
 

 Mr. Julian O. von Kalinowski
 
 [5]
 
 in an excellent article entitled “Key Employees and Trade Secrets” in 47 Virginia Law Review 583 states in the conclusion of the article at page 599:
 

 “Protection should be afforded when, and only when, the information in question has value in the sense that it affords the plaintiff [i.e., ex-employer] a competitive advantage over competitors who do not know of it [i.e., the trade secret],
 
 and where the granting of such protection will not unduly hamstring the ex-employee in the practice of his occupation or profession.
 
 This simple balancing process will invariably protect all of the pertinent interests—those of the former employer, of the former employee, and of the public.” (Emphasis added.)
 

 Turning to the definitional problem of what constitutes a trade secret it is evident that California has adopted
 
 *289
 
 the broad approach set forth in Restatement, Torts, volume 4, section 757, comment b, page 5, as follows:
 

 “b.
 
 Definition of trade secret.
 
 A trade secret may consist of any formula, pattern, device or compilation of information which is used in one’s business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.” (Italics shown.) (See
 
 By-Buk Co.
 
 v.
 
 Printed Cellophane Tape Co.,
 
 163 Cal.App.2d 157, 166 [329 P.2d 147].)
 

 Within the same comment however, it is pointed out that “An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one’s trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information ; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.” Note the comments of the trial judge in paragraph VI of his notice of decision (footnote 1).
 

 It is pointed out in
 
 Ungar Electric Tools, Inc.
 
 v.
 
 Sid Ungar Co., Inc.,
 
 192 Cal.App.2d 398, 403 [13 Cal.Rptr. 268] that “ [t]he character of the secrets, if peculiar and important to the business, is not material;
 
 but it must, as the term implies, be kept secret by the one who creates it. (Riess
 
 v.
 
 Sanford,
 
 47 Cal.App.2d 244, 246 [117 P.2d 694].) ” (Emphasis added.) In the instant case it must be remembered that the so-called trade secrets were embodied in each valve that was sold. This ease does not involve a claim of trade secret alleged to exist in the know-how; or the process under which the valves are made; or any machine; or the tools used in the process of manufacture of the valves. It is appellant’s position that the design features themselves are trade secrets.
 

 It is stated in Restatement, Torts, volume 4, section 757, comment b, page 6:
 

 “Matters which are completely disclosed by the goods which one markets cannot be his secret
 
 [emphasis added].” (See
 
 Sandlin
 
 v.
 
 Johnson
 
 (8 Cir. 1945) 152 F.2d 8;
 
 Northup
 
 v.
 
 Reish
 
 (7 Cir. 1953) 200 F.2d 924;
 
 Carver
 
 v.
 
 Harr,
 
 132 N.J. Eq. 207 [27 A.2d 895].)
 

 Appellant places great reliance upon the ease of
 
 Smith
 
 
 *290
 
 v.
 
 Dravo Corp.
 
 (7 Cir. 1953) 203 F.2d 369, for the proposition that the above set forth rule is not valid. A careful reading of the
 
 Smith
 
 case discloses however that the court was more concerned with the manifest and flagrant breach of .confidence than the fact that the information could have been obtained through lawful means. (See
 
 Wexler
 
 v.
 
 Greenberg, supra,
 
 160 A.2d 430.) Whatever justification existed for the court in the
 
 Smith
 
 ease to disregard the fact that there had been sales of the item embodying the trade secret, there is no breach of confidence in the case at bar and the same policy considerations are not present.
 

 In addition to the sales of the valves embodying the alleged trade secrets, the trial court indicated that a second factual barrier to plaintiff’s theory of being exclusive owner of said trade secrets was: “ (2) The prior art, the previously known, published and utilized ideas, principles, devices and methods in valve manufacture.” (See notice of decision, par. VI, footnote 1.)
 

 In discussing “Novelty and prior art” Restatement of the Law of Torts, volume 4, section 757, comment b, pages' 6-7, provides in part as follows:
 

 “Novelty and prior art.
 
 A trade secret may be a device or process which is patentable; but it need not be that.
 
 It may be a device or process which is clearly anticipated in the prior art
 
 or one which is merely a mechanical improvement that a good mechanic can make. Novelty and invention are not. requisite for a trade secret as they are for patentability. These requirements are essential to patentability because a patent protects against unlicensed use of the patented device or process even by one who discovers it properly through independent research. The patent monopoly is a reward to the inventor. But such is not the case with a trade secret. Its protection is not based on a policy of rewarding or otherwise encouraging the development of secret processes or devices.
 
 The protection is merely against breach of faith and reprehensible means of learning another’s secret. For this limited protection it is not appropriate to require also the hind of novelty and invention which is a requisite of patentability.”
 
 (Emphasis added.)
 

 Absent a situation where the device or process is so widely known as to be within the public domain, it is clear that prior art will not be a defense
 
 where there is a breach of confidence.
 
 (See
 
 By-Buk Co.
 
 v.
 
 Printed Cellophane Tape Co.,
 
 163 Cal.App.2d 157, 166 [329 P.2d 147];
 
 Head Ski Co.
 
 v.
 
 Kam Ski Co.
 
 (D.C., D. Md. 1958), 158 F. Supp. 919;
 
 Sun Dial Cor
 
 
 *291
 

 poration
 
 v.
 
 Rideout
 
 (N.J. 1954) 108 A.2d 442, 445;
 
 Franke
 
 v.
 
 Wiltschek
 
 (2 Cir. 1953) 209 F.2d 493;
 
 Fairchild Engine
 
 &
 
 Airplane Corp.
 
 v.
 
 Cox,
 
 50 N.Y.S.2d 643.)
 

 In
 
 Fairchild Engine & Airplane Corp.
 
 v.
 
 Cox, supra,
 
 50 N.Y.S.2d 643, the court made it quite clear that Cox acquired the knowledge in his confidential capacity, when it was stated at page 653:
 

 “ [7] If Cox did not acquire knowledge of the process from the plaintiffs, in his confidential capacity, where and how and when did he acquire it? Even if others—such as Gay et al.— knew it from other sources, the evidence is quite clear that Cox did not learn it through other channels.”
 

 It was further stated at page 657 as follows:
 

 “ [9] It is quite manifest that after this litigation was projected, the defendant commenced digging in the field of ‘prior art’ to ascertain what had been done and written about bonding aluminum with ferrous metals. Concededly, the field was not entirely virgin . . . Once we conclude that the work done under Cox’s supervision was confidential, and that Cox threatens to breach the confidence, all else is of subordinate importance. ’ ’
 

 However, as stated in paragraph IX of the trial court’s notice of decision (footnote 1), ‘‘Uncontradicted evidence establishes the fact that when Eodrick [sic] Koutnik entered the employ of plaintiff, he carried with him a good deal of knowledge concerning the art, science and mechanics of valve design and manufacture, and a good deal of skill in the application of that knowledge.”
 

 The position of Koutnik in the case at bar is far different from that of Cox in the
 
 Fairchild
 
 ease.
 

 Appellant’s next contention is that it is entitled to relief with respect to the Paragraph V valve design on the basis of Koutnik’s oral agreement not to make competitive use of the same and that the trial court erred in refusing to find the existence of such an agreement or to make any finding at all on such issue.
 

 The trial court did find (finding 14, footnote 2) as follows:
 

 “14. After terminating his employment with Futurecraft on or about March 17, 1956, Koutnik neither carried any trust responsibility nor owed any obligation to Futurecraft with reference to any of the valves or valve components mentioned in Paragraphs V, VI, VII and IX of the first cause of action of the complaint or any of the matters or things allegedly confidential to' Futurecraft with respect to said valves or valve
 
 *292
 
 components, nor did any contractual relation exist between Koutnik and Futurecraft at any time after such termination of employment. ’ ’
 

 The appellant’s contention that the trial court failed to find on the issue is without merit.
 

 The mandate of section 632, Code of Civil Procedure, is that “The statement of facts found shall fairly disclose the court’s determination of all issues of fact in the case.”
 

 Appellant’s contention that Koutnik made an oral agreement not to make competitive use of the valve design was raised in appellant’s complaint and statement of issues incorporated in the pretrial conference order. It is clear that finding 14,
 
 supra,
 
 fairly discloses the court’s determination of that issue.
 

 The basic issue is whether there is substantial evidence in the record to support the trial court’s determination. There is such evidence.
 

 It is asserted in appellant’s reply brief that “the uncontroverted evidence was to the effect that as early as April 1955 on the occasion of Koutnik’s signing of the patent application and assignment on the Paragraph V valve, Piet (as president of Futurecraft) and Koutnik and two other employees of Futurecraft had an express oral agreement that the designs which were developed at Futurecraft were the sole property of Futurecraft, and belonged to it; that such designs were not to be shown or disclosed to competitors; and that such designs were not to be used by such employees after termination of their employment at Futurecraft. ’ ’
 

 However, contrary to the above statement, Mr. Chilcoat, one of the “two other employees” referred to above and one of appellant’s witnesses, testified: “I do not recall that he [i.e., Koutnik] said anything at the time.” Koutnik himself testified that he did not recall it. The trial court under the circumstances was justified in reaching its determination of this issue.
 

 The appellant’s remaining contentions either have already been dealt with or are without merit.
 

 For the reasons stated the judgment is affirmed.
 

 Wood, P. J., and Lillie, J., concurred.
 

 2 3 “See footnote 1 on page 292; footnote 2 on page 298; footnote 3 on page 300,
 

 The trial court’s memorandum provides in part as follows:
 

 “III
 

 “The first subject to which I address my attention is chosen for priority in order not because it has basic significance, although it has, but only because it can, I think, be disposed of most easily.
 

 “J recognize the fiduciary relationship that exists between an employee
 
 *293
 
 and his employer. No conversation between the parties, specifically dwelling upon the subject, was necessary to establish that relationship and the incident duties, they being created and defined by the law. Section 2322 of our Civil Code, being part of an article on the ‘ authority of agents,
 
 ’
 
 states that ‘ [a]n authority expressed in general terms, however broad, does not authorize an agent: . . . 3 To do any act which a trustee is forbidden to do by article two, chapter one, of the last title. ’ This provision directs us back to the cleanly cut statutory delineation of the ‘ Obligations of Trustees ’ found in sections 2228-2239 of the same code.
 

 “These statutes are supplemented by the Labor Code, wherein, in section 2856, the Legislature has decreed as follows:
 

 “ ‘§ 2856.
 
 [Compliance with employer’s directions.]
 
 An employee shall substantially comply with all the directions of his employer concerning the service on which he is engaged, except where such obedience is impossible or unlawful, or would impose new and unreasonable burdens upon the employee. ’
 

 “ ‘ § 2859. [Use
 
 of skill possessed.]
 
 An employee is always bound to use such skill as he possesses, so far as the same is required, for the service specified. ’
 

 “ ‘ § 2860.
 
 Ownership of things acquired by virtue of employment.
 
 Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.
 
 ’
 

 “As pointed out in
 
 Burns
 
 v.
 
 Clark,
 
 133 Cal. 634 [66 P. 12, 85 Am. St. Rep. 233], a key phrase in section 2860 is the phrase ‘by virtue of his employment.’
 

 “A statement of the law on this subject, law which is really quite elementary, appears in 2 California Jurisprudence 2d at pages 769-774; and having satisfied myself of the fairness and reliability of the statement, I have no hesitancy in citing it as a short-cut to an abundance of precedent.
 

 “In relation to all the foregoing, however, we must have in mind that the relationship and duties of an employee to his employer are one matter, and the duty, if any, of an ex-employee to an ex-employer is quite another.
 

 “Whether any duty or interdiction, other than the general duties that rest upon us all, hangs over the ex-employee depends on the existence or nonexistence of either or both of two possibilities: (1) a contract yet in force in one or more respects, and to be performed, or a new contract, or (2) an item of private property, which may be a product of the mind, belonging to the ex-employer, in respect to which the ex-employee still carries a trust responsibility, or the ownership of which, as of any other private property, commands by law the respect of, and forbids the invasion, trespass or conversion by, others than the owner. . . .
 

 “IV
 

 “. . . I refer to the proposition [i.e., urged by plaintiff’s counsel] that by virtue of section 1962, subdivision 2, of the Code of Civil Procedure, the defendant Koutnik is forever bound by recitals contained in the verification of the patent application, Plaintiff’s Exhibit 35, and is now estopped to deny the originality, as of the date of that application, of the inventions and the claims in respect thereto stated in the application.
 

 “The pertinent part of section 1962, Code of Civil Procedure, reads as follows:
 

 “‘§ 1962.
 
 [Presumptions; conclusive].
 
 Specification of Conclusive Presumptions. The following presumptions, and no others, are deemed conclusive:
 

 “ ‘2. The truth of the facts recited, from the recital in a written instrument between the parties thereto, or their successors in interest
 
 *294
 
 by a subsequent title; but this rule does not apply to the recital of a consideration; '
 

 “In the verification to the patent application, Koutnik and Piet made these statements among others not pertinent here:
 

 “ ‘. . . that we have read the foregoing specification and claims and we verily believe we are the original, first and joint inventors of the invention or discovery in High Pressure Valve Mechanism described and claimed therein; that we do not know and do not believe that this invention was ever known or used before our invention or discovery thereof, or patented or described in any printed publication in any country before our invention or discovery thereof, or more than one year prior to this application . . . ’
 

 “It seems clear to me that the intended effect of Code of Civil Procedure, section 1962, subdivision 2, is a limited effect, and that the presumption applies conclusively only when it is relevant to a controversy that questions ‘the obligations or liabilities of the contracting parties’ or ‘their successors in interest’ under the ‘written instrument’ in which the recitals appeared. I say frankly that I know of no California case stating explicitly what I just have said, but a like view, I believe, is implied or insinuated in:
 

 “Gas Appliance Sales Co., Inc.
 
 v.
 
 W. B. Bastían Manufacturing Co.,
 
 87 Cal.App. 301, 306 [262 P. 452] ;
 

 “Taylor
 
 v.
 
 Lundblade,
 
 43 Cal.App.2d 638, 640 [111 P.2d 344];
 

 “Rhine
 
 v.
 
 Ellen,
 
 36 Cal. 362.
 

 “The instant action involves no question concerning the liabilities or obligations of the parties under and/or by virtue of the patent application, Exhibit 35, the verification thereof or the assignment to Future-craft Corporation, and this action is not in any of its causes founded on or claimed to derive from any of or all such instruments.
 

 “ ......”
 
 “Exhibit 35 is, of course, in evidence, and I would say rather conspicuously so. I do not deny or question its place in evidence for all pertinent and reasonable purposes and inferences, not all of which are favorable to plaintiff, but I do . . . refuse to set up a
 
 conclusive
 
 presumption or an estoppel against other relevant evidence, as requested and urged by the plaintiff. [Emphasis shown.]
 

 “V
 

 “. . . a theme that has been intoned by plaintiff throughout this litigation . . . [is] that the one all-important, basic and critical question in this case, and in any similar case, is whether or not the employee, while in the confidential relationship of servant to his master, received ideas or knowledge from his employer, or through his employment, which, since the end of the employment, he has used to his own advantage and/or to the injury of the former employer.
 

 “This theory . . . has been encouraged by the much quoted detached words of Mr. Justice Holmes in
 
 E. I. Du Pont De Nemours Powder Co.
 
 v.
 
 Masland,
 
 244 U.S. 100, 102 [37 S.Ct. 575, 61 L.Ed. 1016], quoted on page 16 of plaintiff’s trial brief:
 

 ‘ ‘ ‘ Whether the plaintiffs have any valuable secret or not, the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be.’
 

 “We find a similarly isolated statement on page 4 of plaintiff’s trial brief, taken from
 
 Fairchild Engine and Airplane Corp.
 
 v.
 
 Cox,
 
 50 N.Y.S. 2d 643, 657 . . .:
 

 “ ‘Coneededly, the field [of prior art] was not entirely virgin. But the plaintiffs’ expenditures [sic] of time and money brought results not reached by others. Once we conclude that the work done under Cox’s
 
 *295
 
 supervision was confidential, and that Cox threatens to breach the confidence, all else is of subordinate importance. ’
 

 “The most clarifying way to deal with this theory that confidence is paramount and all else is subordinate is, I believe, by
 
 reductio ad absurdum. . . .
 

 “Manifestly and necessarily, when we confront the claimed existence of a trade secret, and a claim that it has been misappropriated, trespassed upon or wrongly converted, we are commanded to an inquiry that is just as vital as that which looks for a confidential relationship, namely, an inquiry into the existence or nonexistence of the element of private property.
 

 i C
 
 “California by numerous judicial decisions and by statute long has
 

 recognized private property in products of the mind. Examples of the recognition are the following:
 

 “Civil Code, section 980, subdivision (b) :
 

 “ ‘The inventor or proprietor of any invention or design, with or without delineation, or other graphical representation, has an exclusive ownership therein, and in the representation or expression thereof, which continues so long as the invention or design and the representations or expressions thereof made by him remain in his possession. ’
 

 “Civil Code, section 983, subdivision (b) :
 

 “ ‘If the owner of any invention or design intentionally makes it public, a copy or reproduction may be made public by any person, without responsibility to the owner, so far as the law of this State is concerned. ’
 

 ‘‘ Civil Code, section 984:
 

 “ ‘If the owner of an invention or design does not make it public, any other person subsequently and originally producing the same thing has the same right therein as the prior inventor, which is exclusive to the same extent against all persons except the prior inventor, or those claiming under him. ’
 

 “Hence we are not engaged in mere psychic phenomena or pure speculation or the pursuit of mystery when we inquire whether Mr. Koutnik, when he left the employ of plaintiff, carried with him any knowledge or ideas which then were and still are the private property of the plaintiff.
 

 “VI
 

 “. . . at least certain of the so-called trade secrets claimed by plaintiff are now, and long have been, in the public domain, or if in any instance, the private property of anyone, then the property of someone other than plaintiff.
 

 “In its courageous effort to efface competition from the defendants by the theory of being exclusive owner of certain trade secrets, plaintiff has confronted three distinct and formidable factual barriers: (1)
 
 Its own sales of its valves in the marhet that exists for such products, and its sales and promotional efforts and methods, including public displays (meaning, in this case, of course, displays for that part of the public interested in such products).
 
 [Emphasis added.] (2) The prior art, the previously known, published and utilized ideas, principles, devices and methods in valve manufacture. (3) The filing by plaintiff of an application for patent, Plaintiff’s Exhibit 35, and the incidental necessary disclosure to the public of all those ideas and features claimed to be secret.
 

 “Although our California statutes defining property rights in products of the mind (Civ. Code, §§ 980-985) are not expressly related to the subject of trade secrets, they must be respected as expressions of California’s legislative theory, policy and decision. Civil Code, section 983, subdivision (b), not only specifically states a significant principle, but it is freighted with connotations not to be ignored, It says;
 
 *296
 
 “ ‘If the owner of any invention or design intentionally makes it public, a copy or reproduction may be made public by any person, without responsibility to the owner, so far as the law of this State is concerned. ’
 

 ‘‘ The fact that the structure or configuration of a valve is not obvious to external observation or examination is of no significance in a market such as we deal with here. We cannot know the recipe for a jar of jam, either, just from looking at it. As the evidence conclusively has proved, it is no ‘ trick, ’ but only a matter of some labor and time, for an engineer or a machinist to cut open a valve and see in bare display all the details of its configuration.
 
 Every time a valve was sold, all the ‘secrets’ in its design were transmitted to the purchaser, who then was empowered to transmit them to others as he wished or willed.
 
 [Emphasis added.]
 

 “Counsel for defendants have laid a good deal of stress upon the fact —and it is a fact—that plaintiff made numerous sales of its valves without imposing or attempting to impose any restriction upon the purchaser as to the use to which the valves might be put or the disposition the purchaser might make of them. It is evident to me that I do not attach so much importance to so-called proprietary notices and notices of restrictive use as counsel for defendants possibly do, and as counsel for plaintiff certainly do.
 

 “I recognize, of course, that as between A, a manufacturer and prospective seller, and B, a prospective or actual buyer, any kind of a lawful agreement they wish to, and do, make will be binding upon them . . . But the effect of this private agreement upon others not privy to it, upon the public, and upon a secret or so-called secret, is quite a different matter . . . And I am not convinced that in the commercial world one can preserve a trade secret by the simple device of telling all to whom he reveals it that he claims it to be a secret and his private property.
 

 “I agree with Mr. Lyon that the patent laws of the United States delimit the only legitimate way by which one can establish a monopoly in the commercial utilization of an original mechanical idea. Were we judicially to authorize the creation of a monopoly by the simple and easy method of attaching ‘ proprietary ’ and restrictive notices to products and to the drawings, sales literature, invoices, bills of sale and other papers used in selling and trying to sell them, we would circumvent the patent law and negate the antitrust laws, two chapters of jurisprudence firmly embedded in the public policy of our commonwealth.
 

 “VII
 

 “Facing the prior art in the field of valve manufacture, plaintiff is in the unenviable position of being required to depose or disparage, if he is to surmount the revelation of the evidence, the very doctrine that he must mightily uphold to obtain the relief he seeks or any valuable relief. I refer to the doctrine of equivalence. Plaintiff’s own expert witness, Mr. Gregg, utilized and expounded the doctrine. And defendants ’ expert witness, Mr. Doble, made equally sincere and effective use of the doctrine in displaying the prior art.
 

 “I do not mean to imply that the doctrine of equivalence is needed' to give relevant meaning to every fact and record produced at the trial from the storehouse of knowledge relative to valve manufacture. Indeed, in many details no translation or interpretation through functional analogy is required.
 

 “But the doctrine of equivalence is vital to plaintiff’s ease. It might be called the heart of plaintiff’s cause of action, if plaintiff has any cause of action.
 

 “
 
 The pleadings and statements of counsel and certain of the evidence have made clear to the court that
 
 plaintiff does not contend that either defendant has produced, or threatens to produce, a valve having the
 
 
 *297
 

 exact configuration of any of plaintiff’s valves. It is equally clear that plaintiff does not seek injunctive relief which merely would restrain defendants from producing a valve exactly like any of plaintiff’s valves. Not only does plaintiff pray for an injunction that would make full play of the doctrine of equivalence, hut anything less would he of no value to it.
 
 [Emphasis added.]
 

 “If we were to ask a dozen learned and skillful valve engineers each to work independently of the other, each to avail himself of all accumulated and recorded knowledge of the valve art, and each to design a valve to accomplish a specific function, the probability is that no two of them would produce precisely the same configuration. The point is, as plaintiff well knows and as its pleadings, prayer, evidence and argument all indicate, a valve manufacturer has no advantage over his competitor simply in having a unique configuration, a unique way in which he arranges and uses the commonly held or available knowledge, ideas and mechanical principles relating to the art.
 

 “The court has no choice but to recognize and respect the full significance of the doctrine of equivalence, and doing so, it finds in the prior art, not necessarily alone, but certainly in conjunction with other relevant factors, formidable opposition to plaintiff’s claim of private property in the ideas which it seeks to have defendants enjoined from using.
 

 “VIII
 

 “After a person has applied for a patent from the United States Government and has complied with the law pertaining to the public disclosure of his ideas, he is hardly in a position thereafter to claim that any of the ideas so disclosed is a trade secret. If he establishes a claim of invention, he, of course, will have a right of private property as evidenced by, and to the extent granted in, the patent. Thereupon his rights of monopoly will be controlled by the patent laws, not by any equitable or legal principles applicable to the misuse of trade secrets.
 

 “As stated in
 
 Speaker
 
 v.
 
 Shaler Co.,
 
 87 F.2d 985, (Circuit Court of Appeals, Seventh Circuit; certiorari denied, 301 U.S. 695 [57 S.Ct. 923, 81 L.Ed. 1350]) concerning the filing of an application for patent:
 

 “ ‘The contents thereof were disclosed to the world by filing it [the application] in the patent office. Nothing therein could have remained confidential or secret. ’
 

 “IX
 

 ‘‘ Uncontradieted evidence establishes the fact that when Rodrick [sic] Koutnik entered the employ of plaintiff, he carried with him a good deal of knowledge concerning the art, science and mechanics of valve design and manufacture, and a good deal of skill in the application of that knowledge. We, of course, cannot know precisely what ideas, theories and facts then were lodged in his own brain.
 

 “Much, probably most, of that knowledge had been acquired at the Jet Propulsion Laboratory of the California Institute of Technology, where many young engineers have received not only a theoretical, but an extraordinarily practical, ‘ post-graduate course. ’ It is reasonable to conclude that the learning there imbibed by Koutnik was supplemented by his own independent studies and thinking and possibly by contacts and association with engineers from other institutions.
 

 “It would be impossible for me, as I am sure it would for any counsel in the ease, to draw a boundary line between the knowledge carried by Koutnik into his employment by plaintiff and any additional knowledge or ideas he may have acquired by virtue of that employment. Indeed, no such boundary line exists, for as new knowledge is acquired it integrates itself with the old. We deal here with a sum total of
 
 *298
 
 ideas, theories, facts, principles and skills that we know not how to divide, assuming that a part is attributable to Koutnik’s employment by plaintiff.
 

 “To grant plaintiff the relief requested, or any remedy that would be of value to it, would necessitate enjoining Koutnik from the use of knowledge, a good deal of which certainly is his own or belongs to the public domain, gained by him through his own industry and intellectual faculties, independently of any association with plaintiff, and inextricably interlaced with any knowledge he may have acquired through his employment by plaintiff.
 
 [Emphasis added.]
 

 “To prevent or to attempt to prevent a person from using his own learning and skill, in respect to which he is under no duty of restraint by virtue of a trust or confidence, would be so plainly an injustice and a social and economic folly, that when we have an actual or possible integration of such knowledge with knowledge or ideas encumbered by a prohibition because of their genesis in confidence, the plaintiff seeking prohibitory judgment must carry the burden of identifying and isolating the particular products of the mind in which he claims to have a right of private property.
 

 “X
 

 ‘ ‘
 
 For reasons indicated, I conclude that plaintiff is not entitled to take anything by this action. “
 
 ......”
 

 The findings ■ of fact and conclusions of law are in pertinent part as follows:
 

 “Findings of Fact
 

 “1. At no time during the course of his employment by Futurecraft did Koutnik in any way violate the fiduciary relationship which existed between him and Futurecraft because of such employment nor did he do any act which a trustee is forbidden to do under the laws of this state.
 

 “2. When Koutnik reentered the employ of Futurecraft on or about January 31, 1953, said date being not less than five months prior to the development or designing, or the alleged conception or invention, by Futurecraft of any of the valves or valve components referred to in Paragraphs V, VI, VII and IX of the first cause of action of the complaint, Koutnik brought with him much, if not most, of the knowledge and skill concerning the art, science and mechanics of valve design and manufacture which he utilized in designing and developing, or participating in the design or development of, the valves or valve components referred to in Paragraphs V, VI and VII of the first cause of action of the complaint, or which he utilized in designing or developing, or participating in the design or development of, certain progenitors of the valve referred to in Paragraph IX of said cause of action. If Koutnik acquired any part of said knowledge or skill by virtue of his employment by Futurecraft, then plaintiff has not sustained the burden of identifying or isolating that part of said knowledge or skill so acquired. In this connection, during the course of his employment by Futurecraft Koutnik had no knowledge of the design or internal arrangement of the parts of, or the materials used in, the valve referred to in Paragraph IX of the first cause of action of the complaint, and all of the allegations contained in the third sentence of Paragraph IX of said cause of action are untrue.
 

 “3. None of the matters or things allegedly confidential to Future-craft, as set forth in Paragraphs V, VI, VII and IX of the first cause of action of the complaint and in Answers 4, 8, 34, 57, 104 and 108 of Futurecraft’s answers to Clary's interrogatories, is or ever was owned by, or confidential to, or the private property or a trade secret of, Future-craft. In this connection all of the allegations contained in the third sentence of Paragraph V and in the fourth sentence of Paragraph VI, of
 
 *299
 
 Paragraph VII, and of Paragraph IX of the first cause of action of the complaint are untrue.
 

 “4.
 
 Each and all of the matters and things hereinabove referred to in Paragraph 3 was in the public domain or a matter of public knowledgó or of general knowledge in the trade or industry concerned with the design or manufacture of valves or valve components before any of said matters or things was assertedly conceived, invented, designed or developed by Putureeraft, or in any event before Koutnik terminated his employment at Putureeraft on or about March 17, 1956.
 

 “5.
 
 Each and all of the matters and things hereinabove referred to in Paragraph 3 was known in the art relating to the design or manufacture of valves or valve components, that is to say, was known through patents or applications therefor or through published or utilized materials, ideas, principles, devices or methods relating to such art, before any of said matters or things was assertedly conceived, invented, designed or developed by Putureeraft. In this connection all of the allegations contained in the fourth affirmative defense appearing in the respective answers of Koutnik and Clary are true.
 

 “6. If any matter or thing hereinabove referred to in Paragraph 3 was ever confidential to, or a trade secret of, Putureeraft, every element of confidence or secrecy with respect thereto was made public knowledge, or in any event was lost to Putureeraft, either through deliveries or sales by Putureeraft to its customers or prospective customers of the valves and valve components referred to in Paragraphs V, VI, VII and IX of the first cause of action of the complaint, or through some action taken by the customer or prospective customer subsequent to such sale or delivery, or through drawings showing the internal arrangement of the parts and the design of such valves and valve components delivered by Putureeraft to said customers or prospective customers. Said sales or deliveries commenced in or about September 1953 and have continued to a date not earlier than June 1958. Many of the sales and deliveries of each type of valve and valve component mentioned in said Paragraphs V, VI, VII and IX were made by Putureeraft without imposing, or seeking to impose, any restriction or limitation upon the purchaser or recipient thereof with reference to the use to which such valve or valve component could be put or the disposition which the purchaser or recipient could make of the same. In this connection, with certain exceptions the purchasers and/or recipients of said valves, valve components and/or drawings do not stand in any confidential or fiduciary relation toward Putureeraft with reference to any matter or thing disclosed by said valves, valve components or drawings.
 

 “7.
 
 Each and all of the matters and things alleged to be confidential to Putureeraft with regard to each of the valves and valve components referred to in Paragraphs V, VI, VII and IX of the first cause of action of the complaint were contained in, and were easily ascertainable from, the valves and valve components so sold and/or delivered as hereinabove mentioned in Paragraph 6.
 

 “8. Each and all of the valves and valve components which were sold by Putureeraft, as hereinabove referred to in Paragraph 6, were sold with Putureeraft’s knowledge that the same were purchased by the customer for resale by said customer.
 

 “9. The form of proprietary notice placed by Putureeraft upon certain of its drawings of the valves and valve components referred to in Paragraphs V, VI, Vil and IX of the first cause of action of the complaint was not intended by Putureeraft to impose, nor did it impose, any restriction or limitation upon any customer or prospective customer of Putureeraft, or any ultimate customer or prospective customer of any such valve or valve component, with regard to the use to which such valve or valve component could be put or the disposition which the customer or prospective customer could make of the same.
 

 
 *300
 
 “10. As early as September 1953, Futureeraft publicly sold, without any restriction whatsoever, valves of the type referred to in Paragraph V of the first cause of action of the complaint.
 

 “11. As early as April 1954, Futureeraft publicly sold, without any restriction whatsoever, valve components of the type referred to in Paragraph VI of the first cause of action of the complaint.
 

 “12. As early as December 1957, and thereafter Futureeraft publicly sold, without any restrictions whatsoever, valve components of the type referred to in Paragraph VII of the first cause of action of the complaint.
 

 “13. As early as August 1956, Futureeraft publicly sold, without any restriction whatsoever, valves of the type referred to in Paragraph IX of the first cause of action of the complaint.
 

 “14. After terminating his employment with Futureeraft on or about March 17, 1956, Koutnik neither carried any trust responsibility nor owed any obligation to Futureeraft with reference to any of the valves or valve components mentioned in Paragraphs V, VI, VII and IX of the first cause of action of the complaint or any of the matters or things allegedly confidential to Futureeraft with respect to said valves or valve components, nor did any contractual relation exist between Koutnik and Futureeraft at any time after such termination of employment.
 

 “15. No controversy now exists or ever did exist, between Futureeraft, on the one hand, and Koutnik or
 
 Clary,
 
 or either of them, on the other, concerning the rights, obligations or liabilities of any party to this action under or by virtue of any portion or claim of, or any amendment to, the application for United States Letters Patent, No. 508,444, or the assignment to Futureeraft of the invention described in said application, which said application and assignment are referred to in Paragraph V of the first cause of action of the complaint; and nothing in said application or assignment prevents Koutnik or Clary from establishing the source of the disclosure in said patent application or the lack of secrecy with respect to said disclosure.
 

 ‘‘16. If any matter or thing contained in the application for United States Letters Patent, No. 508,444, mentioned in Paragraph V of the first cause of action of the complaint, or in the application for United States Letters Patent, No. 632,828, mentioned in Paragraph IX of said cause of action, or any amendment to either of said applications, was ever confidential to, or a trade secret of, Futureeraft, Futureeraft elected by sale of valves embodying the disclosure of said applications and the filing of said applications and by taking advantage of the provisions of 35 U.S.C. § 102, to rely upon the patent laws of the United States and is precluded from asserting that the subject matter of said applications, or either of them, constitute a trade secret.
 

 “From the foregoing findings of fact the court draws the following:
 

 ‘ ‘
 
 Conclusions of Law
 

 ‘' The court concludes:
 

 “1. In all respects as set forth in the foregoing findings of fact.
 

 “2.
 
 Said findings having been made upon issues which are determinative of the cause, any further finding or findings upon issues other than those embraced in the foregoing findings would be immaterial and are not made for that reason.
 

 “3. Defendants, and each of them, are entitled to judgment that plaintifE take nothing and that its first amended complaint, as amended, be dismissed, and that defendants recover their costs herein incurred.”
 

 The judgment provides in part as follows:
 

 “It Is Ordered, Adjudsed and Decreed that plaintifE take nothing and that its first amended complaint, as amended, be dismissed, and that defendants recover their costs herein incurred in the sum qí
 

 [4]
 

 The patent application on certain features of the paragraph V valve subsequently resulted in the issuance of a patent on February 7, 1961,
 

 [5]
 

 Mr. von Kalinowski, who is counsel for plaintiff, did not cite his article to the court.