IMI–TECH CORPORATION (formerly IML Corporation), a Delaware corporation, Plaintiff,

v.

John GAGLIANI, an Individual, John Long, an Individual, and Chem–Tronics, Inc., a California corporation, Defendants.

CHEM–TRONICS, INC., a California corporation, John Gagliani, and John Long, Counterclaimants,

v.

IMI–TECH CORPORATION, a Delaware corporation, Counterclaim–Defendants.

Civ. No. 83–1021–R(M).

United States District Court, S.D. California.

April 14, 1986.

Publication Ordered Oct. 28, 1987.

Paul H. Duvall, King & Ballow, San Diego, Cal., Lawrence R. Levin, Wilson P. Funkhouser, Levin & Funkhouser, Chicago, Ill., William T. Rifkin, Keith V. Rockey, McDougall, Hersh & Scott, Chicago, Ill., for plaintiff.

Don W. Martens, Darrell L. Olson, Ned A. Israelsen, Knobbe, Martens, Olson & Bear, Newport Beach, Cal., for defendants.

## ORDER

RHOADES, District Judge.

Good cause appearing, IT IS HEREBY ORDERED that the *attached version* of the Preliminary Injunction Order filed and entered on April 14, 1986, which has been edited to redact trade secrets, may be placed by the Clerk in public files and may be published. Deletions from the original order filed and entered on April 14, 1986, are indicated by brackets.

IT IS SO ORDERED.

## PRELIMINARY INJUNCTION ORDER

Plaintiff IMI–TECH CORPORATION ("Imi–Tech"), duly moved, with notice to the defendants, in accordance with Federal Rule of Civil Procedure 65(a)(1), for Preliminary Injunctions: (1) to enjoin the defendants from directly or indirectly (a) disclosing, licensing, attempting to license, practicing or using certain trade secrets of Imi–Tech relating to polyimide foam technology, and (b) disclosing, licensing, attempting to license, practicing or using certain patents that Imi–Tech has alleged equitably belong to Imi–Tech but are held of record by the defendants ("Preliminary Injunction Re Trade Secrets"); and (2) to enjoin defendants from infringing Claims 1–6 and 8–10 of U.S. Patent No. 4,296,208 (the " '208 Patent") and Claims 25–27 of U.S. Patent No. 4,305,796 (the " '796 Patent"), with respect to the defendants' nongovernmental sales only ("Preliminary Injunction Re Patents").

These motions came on regularly for hearing on March 3, 1986, before the Honorable John S. Rhoades. Lawrence R. Levin and Wilson P. Funkhouser of LEVIN & FUNKHOUSER, LTD., and Paul H. Duvall of SULLIVAN, DUVALL & NOYA, appeared on behalf of moving party Imi–Tech. Darrell L. Olson, Don W. Martens and Ned Israelson of KNOBBE, MARTENS, OLSON & BEAR, appeared on be-

half of the defendants Chem–tronics, Inc., John Gagliani and John Long. After considering the voluminous record, authorities cited in support of or in opposition to these motions, and the exhibits and declarations in support of and in opposition to these motions, the court took the matter under submission. On April 3, 1986, the parties each submitted to the court Proposed Findings of Fact and Conclusions of Law regarding both Preliminary Injunction motions. After reviewing these Proposed Findings of Facts and Conclusions of Law, and after a further consideration of the record, authorities cited in support of or in opposition to these motions, and the exhibits and declarations in support of or in opposition to these motions, The court finds as follows:

## I. FACTS

### A. *Background*

1. Plaintiff Imi–Tech is a Delaware corporation with its principal place of business in Illinois. Imi–Tech conducts business as the successor in interest to a division of International Harvester Company ("IH"). In 1982, IH sold to Imi–Tech all of the tangible and intangible assets, as an ongoing business, of one of IH's divisions which had been known as the Solimide Venture Department (the "Solimide Venture"). Until October 1981, the Solimide Venture had been located at the Solar Research Laboratory ("SRL") of the Solar Turbines International division of IH ("Solar").

2. In 1982, Imi–Tech purchased the Solimide Venture from IH, and IH sold, transferred and assigned to Imi–Tech, among other things (Solimide Purchase Agreement, Ex. A to Supplemental Declaration of Peter Casson, filed February 9, 1984 (Dkt. 144).

(a) certain United States and foreign letters patent and applications for letters patent, legal title to which was held by IH (the "Exclusive Patent Rights");

(b) all technical knowledge, whether or not patentable, unpatented inventions, manufacturing procedures, processes, trade secrets and marketing techniques which the Solimide Venture had acquired (the "Know–How");

(c) all inventions, discoveries, rights, or improvements which were or had been made by the Solimide Venture ("Improvement Inventions");

(d) all of IH's rights and claims, howsoever created or arising, to prevent any other person or entity from practicing, utilizing or disclosing such Exclusive Patent Rights, Know–How or Improvement Inventions;

(e) all of IH's rights and claims, whether arising by implication of law, in connection with employment relationships or otherwise, to prohibit or prevent any of IH's present or former employees from disclosing to any person or entity any information concerning the business of the Solimide Venture, which is of a confidential nature and not generally known in the industry; and

(f) all of IH's rights and interest under Personal Service Agreements of certain present and former employees of IH, including defendants Gagliani and Long.

3. Imi–Tech is a small corporation [sealed]* Polyimide foams presently are Imi–Tech's only business. Declaration of Kenneth R. Meyers, dated July 17, 1985 (Dkt. 458) ("Meyers Dec."), ¶¶ 4 & 5. Imi–Tech is a start-up business in an industry which is in its infancy.

4. Defendant Chem–Tronics, Inc. ("Chem–tronics") is a California corporation with its principal place of business located at El Cajon, California. Chem-tronics is a part of Interlake, Inc. ("Interlake"), which has approximately $700 million in assets and $580 million in sales. Ex. C to Meyers Dec. Chem-tronics' assets, immediately prior to its acquisition by Interlake in 1985, included $16.4 million in current assets and $55.6 million in long-term assets. Ex. C. to Meyers Dec., at 32 n. 8.

5. Defendant John Gagliani ("Gagliani") is a citizen of California. He was an employee of IH from October 4, 1971 to Feb-

---

* Portions in brackets deleted by the court due to confidential sealed material.

ruary 28, 1982, working in polyimide research. As a Solimide Venture employee Gagliani was given access to, had knowledge of, and utilized the IH/Solar's and the Solimide Venture's trade secret, proprietary and confidential information related to polyimides ("Confidential Information"). Declaration of William A. Compton, filed December 13, 1985 (Dkt. 444) ("Compton Dec."), ¶ 16. Gagliani was the principal investigator at Solar for all of the NASA contracts and the Department of Energy ("DOE") contract, and was responsible for preparing the reports submitted to the contracting agencies. In addition, Gagliani worked on many other Solar projects. Compton Dec., ¶ 16.

6. Defendant John Long ("Long") is a citizen of California, and was an employee of IH in charge of the SRL from before 1970 to February 28, 1975, working for IH in California. Deposition of John V. Long, lodged with the Court on December 13, 1985 ("Long Dep.") at 19 & 58. After retiring from IH, Long was employed as a consultant to the Solar division of IH. Long had access to the SRL's (and after its formation, the Solimide Venture's) Confidential Information. Long Dep. at 29.

7. On July 29, 1985, this Court granted the motion of Imi–Tech for a temporary restraining order (the "TRO") enjoining defendants from directly or indirectly disclosing, licensing or attempting to license (1) certain patents that Imi–Tech alleged equitably belonged to Imi–Tech and (2) certain alleged trade secrets of Imi–Tech relating to polyimide foam technology. Order granting Motion of Plaintiff Imi–Tech Corporation for a Temporary Restraining Order, dated July 27, 1985, Dkt. 330. The TRO has remained in effect to this date, a period of approximately eight and a half months.

8. The materials involved in this motion are polymer materials known as polyimides. Polyimide foams are fire resistant and do not emit poisonous gasses when exposed to flames. The uses of flexible resilient foams include seat cushioning, thermal/accoustical insulation and thermal insulation.

### B. *Preliminary Injunction: Trade Secrets*

9. Imi–Tech seeks to enjoin the defendants' use, disclosure or licensing of the following three trade secrets (the "Trade Secrets") relating to polyimide foam technology:

(1) The chemical composition of [Surfactant No. 1], a surfactant manufactured by [Manufacturer A], its characteristics in the making of polyimide prepolymers and foams, and its manufacturer and manufacturer's trade name.

(2) The use, as proprietary surfactants in making polyimide foams, of [class of surfactants], a chemical group that includes [Surfactant No. 1].

(3) The use of [sealed] in making polyimide prepolymers and foams.

10. Plaintiff claims equitable ownership of the defendants' U.S. Patent Nos. 4,407,-980, 4,425,441, 4,433,068, and Re. 31,756 (reissue of U.S. Patent No. 4,394,464,) (the "Equitably Owned Patents").

11. On December 18, 1985, plaintiff filed a Motion for the Preliminary Injunction Re Trade Secrets seeking to enjoin defendants from:

(a) Disclosing, licensing or attempting to license the Equitably Owned Patents and the Trade Secrets of Imi–Tech relating to polyimide foam technology, and

(b) Practicing or using the Equitably Owned Patents or Trade Secrets.

The requested preliminary injunction expands the scope of the TRO, in that it would enjoin the practice or use of said patents and trade secrets, as well as enjoining the disclosure or licensing of them.

12. In connection with their employment by IH, Gagliani and Long each signed a Personal Services Agreement ("PSA") in which each agreed, among other things, to (Exs. A and B to Supplemental Complaint (Dkt. 128):

(a) disclose in writing to his employer or its designees any inventions, improvements, developments or innovations relating to or useful in such employer's busi-

ness, products or projects conceived or made by him while in such employment, whether or not during regular working hours, and any inventions, improvements, developments or innovations that were made by him within one year of the termination of such employment which are competitive with or are related to products or processes of such employer with which he became familiar during his employment;

(b) assign and convey to his employer the complete right, title and interest in and to all such inventions, improvements and developments, conceived or made by him during said periods;

(c) assign to said employer any patents issued on or with respect to any such inventions, improvements and developments; and

(d) regard and preserve as confidential all information pertaining to the employer's business, or that was obtained by him from specifications, drawings, blueprints, reproductions, or other sources of such employer, and not to publish or disclose, either during such employment or subsequent thereto, without the written approval of such employer, any such confidential information obtained by him while in the employment of such employer.

13. A Solar policy on conflicts of interests, adopted March 27, 1961, advised employees (including both Gagliani and Long) that it was "considered to be in conflict with [Solar/IH's] interest:"

> "For an employee to use or reveal (without proper authorization) to a third party, any confidential product information, date on decisions, plans or other information concerning the company or any affiliate, which might be prejudicial to the interests of the company or any affiliate ..."

Gagliani specifically agreed to be bound by this Solar Conflicts of Interest Policy. Compton Dec., ¶ 21; Ex. C to Compton Dec.; Deposition of John Gagliani, lodged with the Court on December 13, 1985 ("Gagliani Dep.") at 338 et seq.

14. John F. Hussey ("Hussey") was employed by IH in the marketing department of Solar as Program Sale Manager–Research. Hussey's job responsibilities included making sure that Solar's research personnel and activities were satisfying the requirements of the research sponsors. Compton Dec., ¶ 8.

15. When Solar hired Gagliani in 1971, he began conducting research into various forms of polyimide-forming resins under the direction of and with the assistance of his immediate superior, Long. At some time before 1973, Gagliani's research resulted in the invention of a family of polyimide-forming resins which were referred to in Gagliani's laboratory notebooks and other Solar documents by the designation "GG-1-2." Gagliani Dep. at 929 et seq.

16. The "GG-1-2" family of polyimide-forming resins is formed by mixing 3,3', 4,4' benzophenonetetracarboxylic acid dianhydride ("BTDA"), non-reactive solvents, caprolactam and diamines which, when heated or "cured," form tough coatings, laminates, and adhesives. When mixed with reactive rather than non-reactive solvents, some of the members of the "GG-1-2" family of resins can produce powder precursors and foams, which Gagliani admitted to a German customer (before this action commenced) were "similar to Solimide foams in every respect." Ex. 5 to Second Supplemental Declaration of Paul H. Duvall, dated July 26, 1983 (Dkt. 39) ("Duvall Dec.")

17. In November, 1975, without Solar's permission or knowledge, Long and Gagliani individually retained Solar's outside counsel, Mr. Richard D. Multer ("Multer"), to apply for patents as joint inventors on the "GG-1-2" family of polyimide resins. Affidavit of William A. Compton, filed August 15, 1983 (Dkt. 57) ("Compton Aff."), ¶¶ 9 & 11; Long Dep. at 100, Ex. 2 to Long Dep.

18. When Gagliani's superior, Mr. Compton, Long's successor, discovered in 1977 that Long and Gagliani were using Multer to try to patent a joint invention that apparently belonged to Solar, Multer withdrew. Compton Aff., ¶¶ 9 & 11. Gagliani assured Solar that he would assign any patents on the "GG-1-2" family of

resins to Solar when they issued. He also stated in a November 30, 1977, memo to Compton that GG–1–2 resins would not foam. Compton Aff. ¶¶ 12, 13 & 15. When the patents issued, Gagliani did not assign them to Solar. Compton Aff. ¶¶ 19, 20 & 23.

19. Defendants alleged in their counterclaim that the polyimide foam made at Chem-tronics is a modification of "GG–1–2." Defendants' Counterclaim at ¶ 27. This prior admission of the defendants contradicts their claim that "GG–1–2 would not foam." Defendants' Opp.Mem. at 47. Defendants' prior pleading is a binding judicial admission that the Chem-lon polyimide foams result from modification of "GG–1–2–."

20. In the early stages of this litigation, defendants contended that their polyimide foams, using a small amount of caprolactam, foamed by means of an "exchange reaction" rather than the "condensation reaction" used in Solar's polyimide foams. Defendants employ only one-tenth as much caprolactam as would be required to react completely with the other ingredients. Defendants have adduced no evidence that the caprolactam chemically reacts at all. Therefore, it is likely that Imi–Tech will be able to establish at trial that defendants' foams are, as Gagliani once wrote, "similar to [IH/Solar's, now Imi–Tech's] Solimide foams in every respect," except for curing temperature, which he said was *lower*. Ex. 5 to Duvall Dec.; Declaration of John Gagliani, dated July 29, 1983 (Dkt. 48) ("First Gagliani Dec."), ¶ 12.

21. Gagliani, although he has claimed that he invented some of the coatings, laminates and adhesives made from "GG–1–2" before he went to work for Solar, did not conceive or make the invention of *foaming* any of the "GG–1–2" resins before he was employed by Solar, and has not contended that he did so. He invented the GG–1–2 low curing temperature resins while employed by IH.

22. Until 1982, Chem-tronics was engaged primarily in the businesses of manufacturing military and commercial jet engine components and making jet engine component repairs. Beginning in 1976 and continuing through the date of this lawsuit, Long has been a consultant to Chem-tronics.

23. In April 1981, Chem-tronics entered into a "Patent License Agreement" ("PLA") with Gagliani (who was then still employed by IH) and Long, under which Chem-tronics licensed from Gagliani and Long patents which they held on certain polyimide coatings, laminates, and adhesives. Ex. 3 to Long Dep. The PLA both licensed certain patents to Chem-tronics and obligated Gagliani and Long to transmit to Chem-tronics all their know-how in regard to *all products* (not just the patented products) made from the same materials as those covered in the patents. In return, Chem-tronics agreed to pay Gagliani and Long a royalty equal to a percentage of Chem-tronics sales of polyimide materials including foams. Long Dep. at 252; Ex. 3 to Long Dep., ¶ 1(c).

24. In August 1981, Long prepared a draft specification sheet for Chem-lon ("GG–1–2") polyimides stating that those polyimides were "useful as ... foams." Ex. 99 to Gagliani Dep. In September 1981, Chem-tronics offered Gagliani, who at the time was still an employee of Solar, a job. Deposition of Leonard Allen, lodged with the Court on December 13, 1985 ("Allen Dep."), at 262; Ex. 100 to Gagliani Dep.

25. Before November 1981, Chem-tronics had engaged another Solar employee, Hussey, to provide it with IH marketing information on polyimide foams which he had obtained as an IH employee. Allen Dep. at 260; Ex. 3 to Allen Dep. Deposition of Daniel J. Brimm, filed with the Court on December 18, 1985 ("Brimm Dep."), at 61–62, 93.

26. On November 14, 1981, a meeting took place, attended by Long, Leonard Allen (Chem-tronics' Vice–President), Daniel Brimm (Chem-tronics' President), Hussey, and Aubrey Burer (now Chem-tronics' President), the purpose of which was to discuss Chem-tronics' polyimide business. Long wrote a memo to Allen shortly after the November meeting, which recounts the discussions that took place during that

meeting. Ex. 4 to Allen Dep. In that memo, Long states that Hussey had said he was "completely familiar with the Harvester Polyimide foam program, current and potential customers, potential uses, most profitable areas of sale, etc." In addition, it states that "Hussey said he was preparing plans for getting [Chem-tronics] into the foam business." The memo then addresses how Gagliani and Hussey thought that Solar would be getting out of the polyimide business, and the costs and plans for Chem-tronics to go into the polyimide foam business. The memo also states that Gagliani had previously told Long that (emphasis added):

"we should not be concerned about the patents because *we can make foam with or without them. In fact we will be able to make a better foam with better properties.* Even though the patents cover compositions and processes *specific experience and knowledge is required to make the foam.* John [Gagliani] says that the patents do not provide all the information needed. He also said we should not buy anything from Harvester, that it would be a waste of money."

This memo contradicts the defendants' contention that they intended to make only IH/Solar's Solimide foam, and to perform government contracts. The memo also records violations of the Solar policy on conflicts of interest by Hussey and Gagliani, in providing marketing information to a competitor (Chem-tronics) and also providing confidential process information to that competitor.

27. Chem-tronics entered into the polyimide foam business without contacting, or attempting to contact, Solar to determine whether Chem-tronics might be misappropriating Solar's Confidential Information. Brimm Dep. at 38.

28. During the time when Gagliani was working for the Solimide Venture he tested various surfactants in the making of polyimide foams. Gagliani Dep. at 1350–51. Surfactants work to give uniformity of bubbles in the foaming process and, therefore, uniformity of cells in the finished foam product. Eventually, after extensive testing, Gagliani came to use the surfactant [No. 1] for thermal/accoustical foams. The [Surfactant No. 1] surfactant is a member of a class of surfactants known as [class of surfactants].

29. Gagliani used the code name [Code 1] for the surfactant [No. 1] during the time he was employed by IH. Gagliani had employed a "double blind" purchasing system to avoid disclosure of [the surfactant's] identity to other Solar employees. The reports on the government contracts in which the [Surfactant No. 1] surfactant was used gave only the code name [Code 1] for the surfactant. Gagliani Dep. at 1154; Lee Dep. at 247; Declaration of David Okey, dated December 4, 1985 (Dkt. 464) ("Okey Dec."), ¶¶ 2–4.

30. Gagliani became employed by Chem-tronics on January 25, 1982. At that time, he and Long signed a "Supplement to Patent License Agreement," explicitly adding to the know-how disclosure and royalty arrangement with Chem-tronics' polyimide foams by both exchange and condensation reactions. Ex. 33 to Gagliani Dep; Gagliani Dep. at 1214–21.

31. On March 3, 1982, three days after his employment at IH had *formally* ended (he received accrued vacation pay for approximately five weeks after he terminated his employment with Imi–Tech), Gagliani was making polyimide foams in a laboratory at Chem-tronics using [Surfactant No. 1]. Gagliani used the code name [Code 2] at Chem-tronics to refer to [Surfactant No. 1] Gagliani Dep. at 1316–19. Gagliani knew from his work at IH that [class of surfactants] were the best surfactants to use in this application.

32. After discovery in this action had revealed the defendants' use of [Surfactant No. 1] the defendants began using a different surfactant which is marketed under the brand name [Surfactant No. 2] Gagliani Dep. at 668–69.

33. The characteristics of [Surfactant No. 2] are substantial equivalents to the characteristics of [Surfactant No. 1].

34. The use of [Surfactant No. 2] or other [class of surfactants] in polyimide foams employing chemical systems used by

the plaintiff and the defendants was not, and is not, generally known in the literature or the trade. Deposition of Charles L. Hammermesh (Dkt. 529) ("Hammermesh Dep."), at 103.

35. Imi–Tech's use of [Surfactant No. 1] and other [class of surfactants] surfactants gives it an advantage in the commercial manufacture of polyimide foams.

36. Based on the record, the Court finds that, for the purposes of making polyimide foam, [Surfactant No. 2] and [Surfactant No. 1] are substantial equivalents to each other and to other [class of surfactants]. Gagliani's selection of [Surfactant No. 2] a surfactant virtually identical to [Surfactant No. 1] to make flexible polyimide foam at Chem-tronics was derived from his knowledge at Solar of the foaming characteristics of [Surfactant No. 1].

*Trade Secrets*

[PARAGRAPHS 37–40 DELETED FROM PUBLICLY-AVAILABLE COPY OF ORDER.]

41. In late 1980, Gagliani discovered, while performing IH sponsored research and development work, [the existence of Trade Secret No. 2] while still achieving consistent, high quality polyimide products. Gagliani reported this discovery in an internal IH report and characterized it as the "most significant" discovery made during the period covered by the report. Ex. 49 to Gagliani Dep.

42. The use of [Trade Secret No. 2] in polyimide foams employing chemical systems used by Imi–Tech and defendants was not, and is not, generally known in the literature or the trade.

43. Gagliani never reported to NASA or anyone outside of the Solimide Venture the 1980 discovery that [Trade Secret No. 2] could be used in place of the [technique] which had always been used in the NASA contract research. Ex. 31 to Gagliani Dep.; Gagliani Dep. at 1530–35; Okey Dec., ¶ 4.

*Government Funding Of Some Solar Polyimide Research And Development Contracts*

44. Some polyimide research and development work at Solar was performed under NASA and DOE contracts, while other research and development work was privately funded. Evidence from Solar records or former Solar personnel (other than the defendants) of precisely how much and which work was government funded has not been obtainable by either the plaintiff or the defendants.

45. The evidence establishes that Gagliani treated the use of [Surfactant No. 1] surfactant as being developed at private expense rather than in the course of government funded research. The Court finds that Gagliani's own conduct established that the [Surfactant No. 1] trade secret was developed at private expense, not governmental expense.

46. The defendants have sought to contradict Gagliani's writings and actions and have contended that the [Surfactant No. 1] and [sealed] trade secrets were developed in the course of Solar's NASA and/or DOE contracts, and that "therefore the government *and all of its suppliers such as Chem-tronics* have unlimited rights to use and disclose the data."

47. Solar's government contracts specified procedures for and gave the government right to "duplicate and disclose all reports of reportable items," but did not include the right to "have others do so" under the circumstances here in issue. The Solar NASA and DOE contracts also gave the government the right, within a year after final payment under the contracts, to order Solar to deliver to the government agency in question any additional data called for under the contract which the government agency later determined it desired. Declaration of Leonard Rawicz, filed December 13, 1985 (Dkt. 440) ("Rawicz Dec."), ¶ 16.

48. It is customary in NASA and DOE contracts for the contractor (here Solar through its employee Gagliani) and the government technical monitors for the contracts to decide which data is to be delivered to the government. Rawicz Decl., ¶¶ 11–13. The government may not receive all data generated under such contracts. Thus, the Government may have inchoate rights in some data which it cannot exer-

cise because the information was never delivered within the time specified.

49. Therefore, even if the [Surfactant No. 1] and [second] trade secrets were developed in the course of the government contracts, the government has never acquired the information, and no longer has any right to obtain the data or to provide the data to the defendants. Rawicz Dec., ¶¶ 16, 18.

*Equitably Owned Patents*

50. Based on the record, including the extensive evidence that Gagliani had developed his GG–1–2 foam and told Chem-tronics about it before he left IH's employ, the Court finds that defendants' polyimide foams (which are made using a small amount of caprolactam) are modifications of "GG–1–2" to make foam, which modification Gagliani conceived or made while he was still subject to his PSA, that U.S. Patent Nos. 4,407,980, 4,425,441, 4,433,068, Re. 31,756 (Reissue of U.S. Patent No. 4,394,-464) were filed by Gagliani and/or Long within one year after Gagliani left his IH employment, and that the patents disclose and claim the modification of "GG–1–2" to produce foam which claims and disclosures were based on Confidential Information received by Gagliani during his IH employment or within one year thereof. Gagliani testified that his recent characterization of Chem-lon foams as an "improvement over" GG–1–2 was something that his lawyer told him to say. Gagliani Dep. at 1962.

51. In a laboratory notebook and at a meeting during late 1980 at the Solimide Venture, Gagliani described an approach for manufacturing closed cell polyimide foams in which polyimide beads (or macroballoons), made using Solimide resin, are placed in a mold, and heat applied so that the macroballoons expand and coalesce into a molded product. Declaration of Raymond Lee, filed July 19, 1984 (Dkt. 315) ("TRO Lee Decl."), ¶¶ 2, 3 & 4; Deposition of Raymond Lee, lodged with the Court on December 31, 1985 ("Lee Depo.") at 278.

52. While Gagliani was at IH, he actually made such polyimide macroballoons. TRO Lee Decl. ¶¶ 3 & 4.

53. In patent applications filed September 26, 1982 (U.S. Patent No. 4,407,980), February 10, 1983 (U.S. Patent No. 4,425,-441), and February 17, 1983 (U.S. Patent No. 4,433,068), all applied for within one year after Gagliani left IH, Gagliani and Long sought patents for the making of closed cell polyimide foams, including the use of polyimide macroballoons made by the foaming modification of "GG–1–2" which was developed by Gagliani during his IH employment. The specifications of each of those patents contains the following statement under the title "Detailed Description of the Invention":

> "Either a consolidated uniform closed cell shaped foam product or a number of macroballoons or beads may be produced, depending on whether full foaming is restrained or unrestrained."

54. The processes and products of using polyimide macroballoons to make closed cell polyimide foams which Gagliani and Long patented in U.S. Patent Nos. 4,407,-980, 4,425,441 and 4,433,068 were conceived and made by Gagliani while he was employed by IH.

*Solar's And Imi–Tech's Efforts To Keep The Confidential Information Secret*

55. Solar and Imi–Tech took reasonable measures to protect the secrecy of their Confidential Information. IH insisted that its employees sign confidentiality agreements. It never disclosed the information at issue outside of IH. Declaration of Raymond Lee, filed December 3, 1984 (Dkt. 262) ("Lee Dec."), ¶ 8.

56. In October 1981, IH moved the Solimide Venture from San Diego to the Chicago area. At the Solimide Venture in Chicago, extensive precautions were taken to protect the secrecy of the information. Okey Dec., ¶¶ 2, 3 & 4.

*Chem–Tronics' Threat To License All Of The Confidential Information Regarding Polyimides To Toray Industries, Inc.*

57. Defendants have admitted that, unless enjoined, they will disclose all of the technology at issue in this motion relating to the making of polyimide foams, to several foreign entities including [Company name omitted], a chemical company in Ja-

pan. Burer Dec., ¶ 13. Allen testified that, if the TRO now in effect were lifted, Chem-tronics would immediately proceed to attempt to license the technology at issue to European and Asian entities beyond the jurisdiction of the Court. Allen Dep. at 48–49, 54. Allen testified that "[w]e would move instantly," (Allen Dep. at 48) and would tell these foreign entities "[e]verything we know literally, how to produce it, what the materials are, what the facilities are, what you can do with it, what the applications are, what its worth." Allen Dep. at 54.

*Irreparable Harm*

58. Defendants' Chem-lon foam is heavier and less flame resistant than Imi–Tech's Solimide foam. Declaration of Richard Andrews, dated July 17, 1986 and filed December 17, 1985 (Dkt. 462) ("Andrews Dec."), ¶¶ 16 & 17. Defendants' marketing of its Chem-lon foams has diminished the reputation of polyimide foams in the market. It has been more difficult for Imi–Tech to convince potential customers of the benefits of polyimide foams to achieve market penetration. Meyers Dec., ¶¶ 3–5; Andrews Dec., ¶¶ 12, 16–17. Defendants' efforts to compete with Imi–Tech by using Imi–Tech's technology and if carried out, their threats to license the technology, threatens to destroy Imi–Tech's fabricator-distributor network, here and overseas, and threatens to irreparably harm Imi–Tech.

59. Imi–Tech has also lost valuable lead time over its competitors which it would have enjoyed by virtue of its trade secrets and assignment of the foam patents which are an integral part of Chem-tronics' polyimide foam business.

60. To stay in business, Imi–Tech must promptly reach a level of sales to which its activities generate sufficient cash flow to operate its business. Meyers Dec., ¶ 4; Andrews Dec., ¶ 16. It is important for Imi–Tech, as a new entrant into the cushioning/insulation materials business, to be able to offer representatives and fabricator/distributors the possibility of exploiting their markets, substantially free from infringing look-alikes. Absent such marketing efforts, there is a substantial risk that Imi–Tech will not be able to continue its business. Andrews Dec., ¶¶ 8–13; Meyers Dec., ¶¶ 3, 5.

61. Chem-tronics' marketing of its foam has harmed and continues to harm Imi–Tech's and its fabricator-distributors' marketing efforts. If Chem-tronics is permitted to expand its market by licensing the patents claimed to be equitably owned by Imi–Tech, or by disclosing or licensing the trade secrets, it likely will deprive Imi–Tech and its fabricator distributors of substantial sales, and deprive Imi–Tech of the marketing potential necessary to a start-up venture.

C. *Preliminary Injunction: Patent Infringement*

62. The patents which are the subject of the motion for Preliminary Injunction Re Patents are U.S. Patent 4,296,208 (the "'208 Patent") entitled "Methods of Preparing Polyimides and Polyimide Precursors," and U.S. Patent 4,305,796 (the "'796 Patent") entitled "Methods of Preparing Polyimides and Artifacts Composed Thereof." Defendant Gagliani was a co-inventor of both patents.

63. Imi–Tech seeks to enjoin the defendants from practicing the processes defined by claims 1–6 and 8–10 of the '208 Patent, and claims 25–27 of the '796 Patent, except for governmental sales.

64. The '796 and '208 patents issued in 1981. The applications leading to those patents were both filed on September 12, 1980, so the "critical date" for establishing invalidity, i.e., one year prior to the filing date, is September 12, 1979.

65. While this litigation was pending, the '796 Patent was submitted by Imi–Tech to the United States Patent and Trademark Office (the "PTO") for reexamination proceedings pursuant to 35 U.S.C. § 302, in view of certain prior art cited by defendants in the present litigation. This prior art included the Final Report under Contract NAS9–15050, which had been prepared by Gagliani for IH, and cataloged and published by the National Technical Information Services more than a year before the filing date of the '796 Patent (Sep-

tember 12, 1980), and other patents and publications cited by defendants in support of their first motion for summary judgment attempting to invalidate these patents. *See* Dkts. 246–294. The PTO issued a Certificate of Reexamination in which a substantial number of the original claims of the patent were cancelled. Claim 25 (as amended) and Claims 26–28, however, were retained and determined by the PTO examiner to be patentable over the newly cited references. Imi–Tech is asserting claims 25 through 27 of the reexamined patent in the present litigation.

*Infringement Of The '796 and '208 Patent Claims*

66. The methods practiced by defendants in preparing their polyimide foams are described in the transcripts to the depositions of Gagliani and Chem-tronics employee Peggy Straub. These methods are used to manufacture defendants' Chem-lon 103, 203 and 503 foams.

### (i) The '796 Patent

67. The elements of reexamined Claim 25 of the '796 Patent are as follows:

(a) "a method of preparing polyimides with cellular structure which comprises the steps of

(b) "forming a primary diamine, 3,3', [sealed] 4,4'–benzophenonetetra-carboxylic acid ["BTDA"] ester solution by dissolving one or more diamines in the aforesaid acid or an anhydride thereof in a lower alkyl alcohol;

(c) "atomizing said solution;

(d) "drying the droplets obtained by atomizing the diamine, ester solution with a heated gas in a chamber, the outlet temperature of the chamber being limited to a maximum of 80° C. to form a dry, particulate nonpolymeric precursor; and

(e) "exposing said precursor to microwave radiation having a frequency of at least 915 MHz for periods of sufficient duration to develop a cellular physical structure and to at least partially develop a polyimide chemical structure."

68. According to their interrogatory answer, defendants mix BTDA with an alcohol, two diamines and a small amount of caprolactam. Except for the caprolactam, this is the same method as that called for by paragraphs (a) and (b) of Claim 25. Defendants contend that there is a chemical reaction between the caprolactam and the BTDA, so that their process does not form the BTDA ester solution as required by Claim 25.

69. Imi–Tech's expert, Dr. Charles Overberger, who performed extensive chemical analyses, unequivocally states, however, that no such chemical reaction between BTDA and caprolactam occurs at the low temperatures involved in the defendants' process. Declaration of Dr. Charles Overberger, filed December 18, 1985 (Dkt. 457) ("Overberger Dec."), ¶¶ 6–9.

70. Defendants' expert, Dr. Shea, stated that "atomizing said solution and drying the droplets obtained by atomizing the diamine, ester solution with a heated gas" are "nothing more than a description of spray drying." Declaration of Kenneth Shea, filed October 26, 1984 (Dkt. 248) ("Shea Dec."), ¶ 11. Gagliani has testified that the Chem-tronics' facility has spray dryers which are the same type as those at IH and described in the '796 Patent. Gagliani Dep., p. 1901. The Chem-tronics' spray dryers have an atomizing wheel for atomizing the liquid resin for subsequent drying with a heated gas. When processing the BTDA-diamine-alcohol solution, the spray dryer outlet temperature is maintained between 65° C. and 70° C. (Gagliani Dep., pp. 2151, 1619.) The result is a dry, particulate, non-polymeric precursor. (Gagliani Dep., pp. 756–57.) The Chem-tronics' processes also satisfy the requirements of paragraphs (c) and (d) of Claim 25 of the '796 Combination Patent.

71. Gagliani has testified, and the defendants have admitted in their interrogatory answers, that the powder precursor resulting from the mixing and spray drying steps is exposed to microwave radiation having a frequency of 2450 MHz, which is "at least 915 MHz."

72. The foregoing findings pertaining to infringement of Claim 25 referred only to Chem-lon 103 foam. Defendants also man-

ufacture polyimide foams known as Chem-lon 203 and Chem-lon 503. These are made by the same method as Chem-lon 103. (Gagliani Dep., pp. 798–99, 2158; Overberger Dec., Ex. C.) The differences between the three compounds are (1) the amount of caprolactam added to the solution and (2) the use of different diamines. These changes do not affect the element-for-element correspondence between the method of Claim 25 of the '796 Patent and the method employed by the defendants.

73. Claims 26 and 27 of the '796 Patent define methods of preparing a polyimide according to Claim 25 and further specify the details of the spray drying chamber, including the inlet and outlet temperatures (Claim 26) and the manner in which the outlet temperature is controlled by regulating the feed rate of ester solution entering the chamber (Claim 27). The use in the Chem-tronics process of the additional elements called for by these dependent claims was established by the deposition testimony of Chem-tronics employee Peggy Straub. A concordance between the dependent claims asserted by Imi–Tech in this Motion and the Straub deposition testimony is attached hereto as an Appendix.

(ii) *The '208 Patent*

74. Claim 1 of the '208 Patent defines a method of preparing a dry, foamable, particulate precursor—i.e., a powder which can be microwaved to form a foam. Claim 9 covers a method of obtaining a polyimide by producing and then heating such a precursor. Claim 1 of the '208 Patent requires:

(a) "a method of preparing a dry, foamable particulate precursor which can be converted into a polyimide by heating it, said method comprising the steps of:

(b) "forming a primary diamine, 3,3', [sealed] 4,4'–benzophenonetetracarboxylic acid ester solution by dissolving one or more such diamines and the aforesaid acid or an anhydride thereof in a lower alkyl alcohol,

(c) "atomizing said solution, and

(d) "drying the droplets obtained by atomizing the diamine, ester solution with a heated gas."

Claim 1 of the '208 Patent is similar to Claim 25 of the '796 Patent. Rather than requiring the precursor to be essentially non-polymeric, however, the powder defined in Claim 1 of the '208 Patent must be "foamable." This requirement of foamability means, however, that the powder is essentially unpolymerized, since the evolution of gasses to form the cells giving a foam must occur during polymerization from heating. If the spray dryed powder is *substantially* polymerized before microwave (or other) heating, it is not foamable. Defendants' processes correspond to and infringe Claim 1 of the '208 Patent.

75. Claim 9 of the '208 Spray Dry Patent requires:

(a) "A method of preparing a polyimide which includes the steps of:

(b) "forming a half ester of 3,3', [sealed] 4,4'–benzophenonetetracarboxylic acid by reacting said acid or an anhydride thereof with a lower alkyl alcohol;

(c) "dissolving one or more primary diamines in the half ester, alcohol solution;

(d) "spray drying the material thus formed to convert it into a dry particulate polyimide precursor, and

(e) "converting the precursor to a polyimide by heating it."

Claim 9 of the '208 Patent calls for preparing a polyimide by forming the ester solution of BTDA, alcohol and one or more diamines; spray drying the material to convert it to a dry, particulate precursor and converting the precursor to a polyimide by heating. Defendants' process corresponds to and infringes Claim 9.

76. The dependent Claims 2–6, 8 and 10 of the '208 Spray Dry Patent are also infringed by the Chem-tronics processes. The element-by-element correspondence between these claims and defendants' processes is set forth in the Appendix.

*Non-infringement Arguments*

77. The defendants contend that there are significant chemical differences between the defendants' foams and those of

Imi–Tech. However, a letter from [Company name omitted], a Japanese chemical company that is a prospective licensee of Chem-tronics, to Allen, dated April 18, 1985, states that caprolactam does not react with BTDA (Plaintiff's Mem.Ex. 2):

" * * * We understand the followings [sic] could be potential problems to effectively commercialize this technology:

1) After tracing the chemical reactions described in your patent, we have found that caprolactam does not react with benzophenone-tetracarboxylic anhydride (BTDA). If this is true, we are very much concerned about validity of your patented technology."

78. In a supplement to their answer to Imi–Tech's interrogatory asking the grounds on which the defendants deny infringement, the defendants have asserted that their processes do not infringe because the powder precursor is not "monomeric," and therefore is not "nonpolymeric" within the meaning of the claims. Defendants' assertion is semantics. The patent specifications indicate that the word "nonpolymeric," as used in the claims, is not such an absolute term. The first words of the '796 Patent describe the inventions claimed and disclosed therein as "methods of converting essentially unpolymerized precursors into polyimides." "Nonpolymeric" does not mean "monomeric," but rather "essentially unpolymerized."

*Irreparable Harm*

79. The "sample distribution list" exhibit, which was attached to Ex. A, of Defendants' and Counterclaimants' Supplemental Response to Plaintiff's Second Set of Interrogatories (Interrogatory No. 21), discloses that defendants have sent their foam to more than 360 different users of potential users of that foam. Of these, less than 30 are agencies of the United States government. Many are not governmental users. The Declaration of Richard A. Andrews, a West Coast fabricator and distributor of cushioning/insulation materials, shows that defendants are making actual sales to Boeing Commercial Aircraft Company and one of its suppliers, for use on commercial passenger jets. Andrews Dec. ¶¶ 14, 15.

80. Chem-tronics' Chem-lon 103 foam specification sheets show that its foam is both heavier and more flammable than Imi–Tech's Solimide foam. Light weight, flame resistance, ability to withstand high temperatures, and the lack of toxic fumes when exposed to flame are the foremost advantages of polyimide foam. Chem-tronics' foams provide less incentive for potential customers to switch from other cushioning/insulating products to polyimide foams and damage the reputation of Imi–Tech's foam and Imi–Tech's corresponding goodwill. Andrews Dec. ¶¶ 16, 17.

81. The impact upon Imi–Tech of defendants' infringing non-governmental sales cannot accurately or easily be measured in money. Each sale lost to defendants or as a result of their efforts has effects on Imi–Tech's customer relationships beyond just the loss of that sale. This constitutes serious and irreparable harm to Imi–Tech. Andrews Dec. ¶ 16; Meyers Dec. ¶¶ 3–5.

*Patent Validity: "On Sale" Bar*

82. Defendants contend that the patent claims in suit are invalid under 35 U.S.C. § 102(b), because products of the process inventions were "on sale" more than one year prior to the filing of the application, i.e., before September 12, 1979. Defendants argue that Solar "sold" polyimide foam produced by the process inventions because Solar, a NASA R & D contractor, transferred foam samples to two other NASA R & D contractors, RCA and the University of Pennsylvania. Defendants also allege that Solar commercially exploited the process inventions by demonstrating the processes to the Bay Area Rapid Transit Authority ("BART").

83. As documented in the Declarations of NASA employees, RCA employees and former Solar employees, Solar was contacted in 1977 by the NASA–Goddard Space Flight Center, in Solar's capacity as a NASA R & D Contractor, at the direction of the NASA–Johnson technical monitor supervising the Solar contract. Declaration of Dr. Roamer E. Predmore, filed December 13, 1985 (Dkt. 450) ("Predmore Dec."); Declaration of Archie Fitzkee, filed Decem-

ber 13, 1985 (Dkt. 446) ("Fitzkee Dec."); Declaration of Dr. Benjamin Seidenberg, filed December 13, 1985 (Dkt. 449) ("Seidenberg Dec."); Declaration of Robert B. Crouch, filed December 13, 1985 (Dkt. 445); and Compton Dec. As a result, foams were prepared and shipped to NASA–Goddard and its contractor, RCA, in 1977, for testing in the course of attempting to develop components for the TIROS–N satellite series. Predmore Dec., ¶¶ 4, 6. These foams were not prepared by practicing the processes here at issue, but were prepared by vacuum drying and either thermal or microwave heating. Declaration of Raymond Lee, filed December 13, 1985 (Dkt. 447) ("Patent Lee Dec."), ¶ 4.

84. The RCA engineer in charge of developing the satellite louver blades which used the foam, Edward Moshey, was advised by Gagliani that the foam was being produced only in small "experimental batches" and that no inventory of foam was maintained for sale. RCA received foam samples which were of varying quality. RCA and its research and development sponsor, NASA–Goddard, extensively tested the foam sheets. Declaration of Edward A. Moshey, filed December 13, 1984 (Dkt. 442) ("Moshey Dec."), ¶¶ 6–16.

85. Later shipments of foam to RCA in 1978 were part of the same ongoing testing program. Many of these foams were rejected and sent back to Solar because they varied from RCA's specifications. Patent Lee Dec., ¶¶ 10–12. The evidence shows experimentation and extensive testing under NASA's guidance and control.

86. The University of Pennsylvania ("U.Pa.") was another NASA R & D contractor which was engaged in designing apparatus for an experiment which NASA conducted in 1981 aboard the space shuttle. Under NASA's guidance and control, Solar shipped foam samples in 1979 to a U. Pa. laboratory which was funded solely by NASA. The foams had been made using spray drying and microwaving. Mr. David Chapman, the U. Pa. Project Manager, was advised by Gagliani in mid-1979 that the density of the material was uncertain, that it would take at least two months to get a definite value, that there was no production system set up for the foams, that Solar was not in production, and that it would take months before Solar would be ready to make any foams. Declaration of David K. Chapman, filed December 13, 1985 (Dkt. 443) ("Chapman Dec."), ¶¶ 2, 5, 9–17.

87. NASA directed the U. Pa. laboratory to obtain and test the Solar foam. At that time, Solar was resisting requests for even samples of the material unless made by or on behalf of its research sponsor, NASA–Johnson. Chapman Dec., ¶¶ 9–12, 19.

88. It is implicit in the relationship between NASA and its R & D contractors that any test results indicating the need for further development would be utilized by the development sponsor. Rawicz Dec., ¶¶ 15, 17–18.

89. In the course of carrying out a California Public Utilities Commission order to ascertain the availability of, and test, fire-safe materials for possible use in its cars, BART personnel came into contact with NASA, and with McDonnell Douglas, which also performed contracts for fire testing of materials under the NASA Fireman Program. The BART director of purchasing, William Thomas, and another BART official Ralph Weule, however, lost interest in the Solar polyimide research when they learned they could not obtain any pricing for the foams, and when they were told by Solar that the foams were not available. Deposition of Charles E. Jenkins dated September 11, 1985, and lodged with the Court on December 13, 1985 ("Jenkins Dep."), pp. 11, 15, 17, 25; Deposition of William Thomas, lodged with the Court on December 23, 1985 ("Thomas Dep."), pp. 16, 25.

90. Thereafter, the only contact between Solar and BART was through Mr. Charles Jenkins, a BART engineer engaged in BART's testing program and his colleagues. Mr. Jenkins and his superior, a BART engineer named Max Gantswig, visited Solar in April, 1979. After viewing several samples of foam, Mr. Gantswig, an experienced process engineer, concluded that "the process for making this material

[Solar polyimide foam] was still in an experimental stage." Declaration of Max Gantswig, filed January 6, 1986 (Dkt. 494) ("Gantswig Dec."), ¶¶ 6, 7, 11.

91. Imi–Tech has presented substantial evidence showing that the process inventions were not complete prior to the "critical date." Prior to consultations in late 1979 and 1980 by Dr. Charles H. Ware, the process inventions could not reliably produce useable, homogeneous foams of either the seating foam type or the insulation foam type. Declaration of Charles H. Ware, filed December 13, 1985 (Dkt. 451) ("Ware Dec."), ¶¶ 7, 10, 11, 13–14, Ex. A. The declarations of former Solar employees William A. Compton and Robert B. Crouch, and the declaration of Dr. Charles H. Ware, Jr. (an expert chemical engineer who was a consultant to Solar), state that they carefully observed Gagliani's ability to practice the spray drying and combination microwave-spray drying processes in late 1979 and early 1980, *after* the critical date. These declarations demonstrate that Gagliani could not obtain reproducible results, or consistent foaming, until after the critical date. *See, e.g.,* Ware Dec., ¶¶ 10–13.

92. Even as late as June–July, 1980, Gagliani was still studying the critical issue of spray drying outlet temperatures, and the effect of spray drying outlet temperatures on properties of the powder, including systematic effects of drying parameters on the residual volatility of the powder and its particle size. This was one of the breakthroughs in achieving practical utility for the spray drying techniques which were patented. Ware Dec. ¶ 16; Lee Dec., ¶¶ 20, 22.

93. The Court finds that, based on the entire record, at the time of the transfers of foam to RCA and the U. Pa., the inventions claimed in these patents had not yet been made, the experiments to determine the parameters of the inventions were still continuing, and that these experiments continued until well after the critical date.

*Patent Validity: Obviousness*

94. Defendants contend, through their expert Dr. Hamermesh, that the inventions claimed in the '208 Patent and the '796 Patent would have been obvious under 35 U.S.C. § 103 to a person of ordinary skill in the art at the time the inventions were made. Dr. Hamermesh's opinions are based upon prior art patents relating to spray drying.

95. An article by Dr. Keith Masters, an expert on spray drying, was attached as Ex. MM to the defendants' first motion for summary judgment. Dr. Master's article reported his unsuccessful efforts to correlate liquid feed rates, gas flow rates, and disk speed to spray dryer performance and the qualities of products produced by spray drying. He concluded that those efforts led to a "lack of rational analysis," requiring "industrial dryer designs [to be] based upon empirical experience ..." Ex. MM, Dkts. 246–94.

96. Imi–Tech's expert Professor E. Johansen Crosby, a professor of Chemical Engineering at the University of Wisconsin who has written more than 25 articles on spray drying, concluded—as did Dr. Overberger—that none of the prior patents on which defendants rely (Mr. Acle's U.S. Patent No. 3,506,583; Gagliani's U.S. Patent No. 4,070,312 and the Gulf Oil Patent No. 4,218,555) teach or suggest spray drying as claimed by the inventions of the patents in suit. Declaration of E. Johansen Crosby, filed January 6, 1986 (Dkt. 495) ("Crosby Dec."), ¶¶ 11, 16. Defendants' Ex. MM (the Master's article) illustrates that spray drying is essentially "empirical" rather than predictable. Professor Crosby points out that each material to be spray dried requires different processing parameters. Crosby Dec. ¶¶ 7, 11–14.

97. The elements of the patent claims in suit are not suggested by the patents upon which the defendants rely.

*Validity: Prior Publication*

98. Defendants also assert that the Solar's interim research reports filed with NASA, and the Solar data sheet delivered to BART constitute, for §§ 102/103 purposes, invalidating "printed publications." The reports and data sheet were not disclosed to the public, were not available under FOIA, were not in libraries, were

neither indexed, catalogued or otherwise classified to enable persons skilled in the art, with the exercise of reasonable diligence, to find the reports or data sheet.

99. The defendants have been able to obtain the NASA interim reports only from Imi–Tech through discovery. Gagliani Dep. Ex. 37.

100. Professor Crosby further explains that, consistent with his view and that of Masters that an enabling disclosure of spray drying requires teaching of processing parameters, the Solar data sheet, which merely refers to spray drying, also does not anticipate or render obvious the inventions of the patent claims in suit. Crosby Dec., ¶¶ 7, 15.

*Patent Invalidity: Best Mode Requirement*

101. Defendants maintain that the patents are invalid under 35 U.S.C. § 112 for violating the statute's best mode requirement concerning the use of surfactants.

102. At the time the patent applications in suit were filed, Gagliani and his co-workers were concerned with many different kinds of polyimide foams which utilized different surfactants, or none at all. The disclosures of the patents in suit do describe a variety of surfactants which can be used.

103. The particular surfactants are not part of the claimed inventions, and representative examples of suitable surfactants were provided.

*Intervening Rights*

104. Defendants assert that 35 U.S.C. §§ 307 and 252 entitle them to "intervening rights" against enforcement of the '796 Patent, after the reexamination proceeding, in which the Patent Office allowed, after consideration of additional prior art, the claims asserted against defendants.

105. In the reexamination proceeding, the patent examiner required Imi–Tech to add to Claim 25 an outlet temperature limitation which was already contained in dependent Claim 26. Similarly, dependent Claim 27, which depends from Claim 26, also always has had the outlet temperature limitation added to Claim 25 in the reexamination proceeding, and therefore, disentitles defendants to any claim of intervening rights. The change in Claim 25 narrowed it to conform to the implicit original intent. Defendants continue to infringe the claim in its narrower form.

106. The foregoing Finding of Facts are based not only on the portions of the record cited, but also on the Court's evaluation of the entire record in this case. Any Finding of Fact that is deemed in whole or in part to be a Conclusion of Law is hereby designated as such.

## II. CONCLUSIONS OF LAW

### A. *Preliminary Injunction: Trade Secrets*

1. The Court has subject matter jurisdiction of this cause pursuant to 28 U.S.C. §§ 1338 & 1332 and personal jurisdiction over the parties. Although this action is appealable to the United States Court of Appeals for the Federal Circuit, the substantive law governing this Preliminary Injunction Re Trade Secrets motion is the law of the Ninth Circuit and of California. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422 (Fed.Cir.1984).

2. Imi–Tech has moved for preliminary injunctive relief against defendants' licensing or disclosing its trade secrets, and to prevent defendants from licensing or practicing certain patents equitably belonging to Imi–Tech but held of record by defendants. Imi–Tech's motion is based on contractual duties owed by Gagliani and Long to Imi–Tech's predecessor, IH, on breaches by Gagliani and Long of their fiduciary duties to IH, and on California statutes including the California Uniform Trade Secret Act, Cal.Civ.Code § 3426 et seq., Cal.Labor Code § 2870.

3. Under applicable Ninth Circuit law, in order to obtain a preliminary injunction, Imi–Tech must demonstrate either:

"(1) A combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships

tips sharply in its favor.... These are not separate tests but the outer reaches 'of a single continuum.'"
*Los Angeles Memorial Coliseum Comm. v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980).

4. Imi–Tech has the burden of showing:

(a) a legally protectable trade secret; and

(b) a legal basis, either a covenant or a confidential relationship, upon which to predicate relief. *Futurecraft Corp. v. Clary Corp.*, 205 Cal.App.2d 279, 283, 23 Cal.Rptr. 198 (1962).

5. Imi–Tech has met its burden by showing the probable existence of trade secrets, the access to or acquisition of the secrets by former employee/defendants under an obligation of confidentiality, and the use or disclosure by these employees and their present employer of the secrets, and serious and irreparable harm. *Maxwell Alarm Screen Mfg. Co. of Cal., Inc. v. Protective Service Corp.*, 218 U.S.P.Q. 580 (C.D.Cal.1982).

■ 6. IH assigned to Imi–Tech its rights to enforce the contractual and common law fiduciary duties owed by Gagliani and Long to IH in regard to the Confidential Information originally developed at the Solimide Venture department of IH, and predecessor SRL units engaged in research and development relating to polyimide foam, as well as their contractual duties to IH to disclose and assign only to IH (or its designees, such as Imi–Tech) any invention which was either conceived or reduced to practice during their IH employment, or within one year of the termination of their employment with the IH/Solimide Venture. The PSAs Gagliani and Long signed are valid and enforceable, both as to patents on inventions made during employment, and as to those "which were based upon secrets or confidential information of the employer and which were conceived during employment or within one year of termination." *Armorlite Lens Co., Inc. v. Campbell*, 340 F.Supp. 273, 275 (S.D.Cal.1972).

■ 7. In addition, Gagliani and Long owed fiduciary obligations to IH/Solar to keep secret technical and marketing information learned or created in their employments, as each was a management employee and in view of IH's efforts to maintain secrecy and their knowledge and participation in these efforts. *Winston Research Corp. v. Minnesota Mining and Manufacturing Co.*, 350 F.2d 134, 140 (9th Cir.1965).

8. California follows the definition of the Restatement of Torts § 757 in defining trade secrets as "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. A substantial element of secrecy must exist so that, except by the use of improper means, there would be difficulty in acquiring the information." Restatement of Torts § 757, Comment (b).

9. Imi–Tech has shown a likelihood of success of establishing at trial that the following information constitutes trade secrets: [sealed]. Imi–Tech has also shown that defendants' processes bear a substantial identity with Imi–Tech's trade secrets, by defendants' use of [Surfactant No. 1] and their switch to the [Surfactant No. 2] surfactant (which is also [a member of the same class of surfactants]) and the defendants' use of [Trade Secret No. 3] Imi–Tech has also shown that the defendants have misappropriated those trade secrets.

10. Upon this showing, the burden shifts to the defendants to prove that they independently developed those trade secrets. *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir.1976). The defendants have not carried this burden.

11. Imi–Tech has shown that the defendants' disclosure or licensing of the above trade secrets will cause it irreparable harm, by placing the subject matter of this litigation beyond the jurisdiction of this court, thereby denying Imi–Tech the opportunity of obtaining complete relief, *CPG Products Corp. v. Mego Corp.*, 502 F.Supp. 42 (S.D.Ohio 1980), since Imi–Tech would not be able to obtain injunctive relief preventing disclosure or use of the Confiden-

tial Information by a third party in Japan where the defendants plan on licensing [a company]  Moreover, such foreign or other licensing or disclosure would cause irreparable injury to Imi–Tech in that it would permit the defendants, who misappropriated the Confidential Information, to reap the benefits of using it.  This is an appropriate subject for a preliminary injunction.  *K–2 Ski Co. v. Head Ski Co., Inc.*, 506 F.2d 471 (9th Cir.1974); *Winston Research*, 350 F.2d at 142.  That the defendants have published some of the information which might lead to discovery of Imi–Tech's trade secrets does "not deprive plaintiff of his preexisting cause of action or of his right to complete injunctive and monetary relief against the wrongdoer."  *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 434 (3rd Cir.1982) (Pennsylvania Law which, like California law, applies the Restatement definition of trade secrets).  Irreparable injury is also shown by the evidence of Imi–Tech's investment of time and money in the development of the secret processes misappropriated by defendants, which Imi–Tech markets both in the United States and abroad, since harm to Imi–Tech's competitive position lacks any adequate remedy at law.  *Apple Computer, Inc. v. Formula International Inc.*, 725 F.2d 521, 525–26 (9th Cir.1984).

12.  Imi–Tech also seeks preliminary injunctive relief against the defendants' practicing or licensing U.S. Patent Nos. 4,407,-980, 4,425,441, 4,433,068, Re. 31,756 (Reissue of U.S. Patent No. 4,394,464).  Imi–Tech has shown a probability of success in establishing at trial that said inventions were made by Gagliani and/or Long during their employment by Solar and that they are, therefore, the subject of Gagliani's and Long's PSAs requiring assignment of such inventions and patent applications and patents thereon.

13.  Chem-tronics and Long have used improper means to obtain rights to these inventions, and to the above trade secrets, because of the violation by Gagliani and Long of express or implied duties of nondisclosure or nonuse.  *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 404 (9th Cir.1982).

14.  Even assuming that Imi–Tech's trade secrets had been developed by Gagliani in the course of Solar's government contracts, Gagliani, Long and Chemtronics may nevertheless be enjoined against benefitting from them, since it is not a requirement of California law that a trade secret "not be readily ascertainable by proper means by others," and California law emphasizes punishing the wrongful acquisition of information, even if it could have been obtained legally.  *Chicago Lock Co., supra*, 676 F.2d at 404.

15.  Defendants' assertion that the information in question was developed under Solar's government contracts, and therefore should have been in the public domain, does not provide a defense, either under California trade secret law, or under federal law.  If the information was developed under government contracts, the alleged contractual right to have information in the public domain belongs to the government, not to the defendants.  *Chemshare Corp. v. United States*, 210 U.S.P.Q. 585, 586 (S.D.Tex.1980); *Mead Corp. v. United States*, 652 F.2d 1050, 1053 (D.C.Cir.1981); *Narda Microwave Corp. v. General Microwave Corp.*, 201 U.S.P.Q. 231 (E.D.N.Y. 1978).

16.  The defendants' attempts to show that Imi–Tech's alleged trade secrets were known in the prior art also fail to provide a defense for the defendants, since it is not required that a trade secret be patantably nonobvious or novel.  Restatement of Torts § 757, Comment (b); *Futurecraft Corp. v. Clary Corp., supra*, 205 Cal.App.2d at 290, 23 Cal.Rptr. at 212.  All that is required is that, except by use of improper means, there would be difficulty in acquiring the information.  Imi–Tech has shown by Gagliani's own testimony and documents which he signed while an IH employee that it would be difficult to acquire the information.

17.  Defendants have other businesses from which they can derive revenue, including the making of coatings and adhesives in the case of Chem-tronics, Gagliani and Long, and in the case of Chem-tronics its jet engine components and repair business-

es. Therefore, the harm to them from enjoining the licensing or disclosure of the trade secrets or equitably owned patents alleged by Imi–Tech should not be substantial. Similarly, the harm to the defendants of delaying foreign licensing or disclosure of the trade secrets and patents at issue on this motion should not be substantial. Imi–Tech's only business, on the other hand, is the production of polyimide foams. It is likely that Imi–Tech would not survive an immediate surge in the practice of polyimide foam technology by licensees of the defendants. The balance of hardships therefore tips sharply in Imi–Tech's favor.

18. Imi–Tech has, therefore, met the standards for issuance of a preliminary injunction whose scope is identical to that of the TRO.

19. Although the court finds that the balance of hardships tips sharply in favor of Imi–Tech, because the defendants may suffer harm if they are later found to have been wrongfully enjoined, an increase in the amount of the bond that currently secures the TRO is appropriate.

B. *Preliminary Injunction: Patents*

1. Jurisdiction is not in dispute and is established under the federal patent laws, 35 U.S.C. § 1 *et seq.*, and under 28 U.S.C. § 1338.

2. The cause before the Court is Imi–Tech's motion for a preliminary injunction against defendants' infringement of U.S. Patent No. 4,296,208 and U.S. Patent No. 4,305,796, other than by or for the United States government under 28 U.S.C. § 1498.

3. In *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1269 (Fed.Cir.1985), the Federal Circuit approved the trial courts' use of the following four factors in ruling on motions for patent preliminary injunctions:

"(1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(4) whether the granting of a preliminary injunction will disserve the public interest."

The Court noted that no one element should be dispositive and that courts must be careful not to allow rich infringers to devastate a less affluent patent-holder's patent-based business, rejecting "the view that an alleged infringer's 'ability to compensate' must end a court's inquiry." *Id.* at 1269 n. 2.

4. The Federal Circuit's teaching that no one element be dispositive is analogous to the two-part test of the Ninth Circuit that a preliminary injunction is justified when the movant establishes either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardship tipping in its favor. *Los Angeles Memorial Coliseum, supra,* 634 F.2d at 1201. A strong showing of likelihood of success reduces the need of a strong showing of irreparable harm and *vice versa. Benda v. Grand Lodge of IAM,* 584 F.2d 308, 315 (9th Cir. 1978), *cert. denied,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

5. Imi–Tech has established a high probability of success on the merits of its claim that the defendants are infringing the patent claims in issue here. Imi–Tech has established that defendants' processes to prepare its Chem-lon 103, 203 and 503 foams literally and directly infringe Claims 25–27 of U.S. Patent No. 4,305,796 and Claims 1–6 and 8–10 of U.S. Patent No. 4,296,208. Defendants' non-infringement arguments are factually and legally unfounded. Direct infringement has been established. *See, e.g., Graver Tank & Manufacturing Company, Inc. v. Linde Air Products, Company,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

6. Imi–Tech has established that it will suffer irreparable harm if defendants' infringing activities continue. *See, e.g., Re-*

*gents of the University of California v. American Broadcasting Companies, Inc.,* 747 F.2d 511, 519 (9th Cir.1984); *Apple Computer, Inc. v. Formula International Inc.,* 725 F.2d 521, 525–26 (9th Cir.1984); *Maxwell Alarm Screen Mfg. Co. v. Protective Service Corp.,* 218 U.S.P.Q. 580 (C.D. Cal.1982).

7. The public interest is in favor of the issuance of a preliminary injunction. "The antitrust laws require competition, not piracy." *Standard Oil Company (Kentucky) v. Humble Oil and Refining Company,* 363 F.2d 945, 954 (5th Cir.1966), *cert. denied,* 385 U.S. 1007, 87 S.Ct. 714, 17 L.Ed. 2d 545 (1967).

■ 8. In order for a preliminary injunction to issue, a showing of likelihood of success on the issues of validity and infringement is necessary. *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (Fed.Cir.1985); *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269 (Fed.Cir. 1985); *Smith International v. Hughes Tool Co.,* 718 F.2d 1573, 1580–1581 (Fed. Cir.1983). The parties dispute on whom the burden of showing validity and infringement falls. Plaintiff Imi–Tech argues that the defendants have the burden of proving invalidity by "clear and convincing evidence," while the defendants naturally contend that plaintiff must make a clear showing of likelihood of success on both the validity and infringement issues. Plaintiff Imi–Tech does not appear to contest its burden of showing infringement.

9. In general, "a patent shall be presumed valid...." 35 U.S.C. § 282. Section 282 mandates that "The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

■ 10. In the context of a motion for a preliminary injunction, however, the Federal Circuit has held that "when a patentee 'clearly shows' that his patent is valid and infringed, a court may, after a balance of all of the competing equities, preliminarily enjoin another from violating the rights secured by the patent." *Atlas Powder Co., supra,* 773 F.2d at 1233. Where the validity of a patent is unchallenged in a prelimi-

nary injunction context, the patent owner may rely on the statutory presumption of validity. *Roper Corp., supra,* 757 F.2d at 1270. However, in this suit the validity of both the '208 and the '796 Patents has been challenged. Thus, the burden is on Plaintiff Imi–Tech to establish patent validity in this motion for preliminary injunction.

11. The court finds that the record in this case shows Imi–Tech has satisfied its burden. To date, the '208 and '796 Patents have withstood two attacks on their validity in the form of summary judgment motions. Imi–Tech has also clearly shown in its moving papers and supporting documents in the instant motion that it has a likelihood of success on the issue of patent validity.

■ 12. In determining whether there has been a sale within the meaning of § 102(b), this Court must look to the "totality of the circumstances," in order to "give effect to the underlying policies [of § 102(b)]." *Western Marine Electronics, Inc. v. Furuno Electric Company, Ltd.,* 764 F.2d 840, 844–45 (Fed.Cir.1985). In *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860 (Fed.Cir.1985), the Federal Circuit listed, as one of the underlying policies of Section 102(b), that of giving the inventor "a reasonable amount of time following the sales activity to determine the value of a patent." Moreover, "the invention must have been 'sufficiently tested to demonstrate that it will work for its intended purpose." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 623 (Fed.Cir.), *cert. denied,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

13. The "Sales Orders" proffered by defendants as evidence of "sales," are only one factor in the "totality of the circumstances" analysis. The Court has also considered (a) whether the transfers of foam constituted "sales" within the meaning of § 102(b); (b) the stage of development of the invention; and (c) whether the transfers were incidental to an ongoing program of experimentation. *Western Marine Electronics, supra,* 764 F.2d at 844–45. The Court concludes that the evidence does not

show that the process inventions were "on sale" or in public use within the meaning of 35 U.S.C. § 102(b) prior to the critical date.

14. Solar's transfer of the government-owned foam materials to RCA and the U. Pa. did not constitute "sales." Ownership and/or control of the materials continued in the government at all relevant times. *See e.g., In re Economy Cab & Tool Co., Inc.,* 47 B.R. 708 (Bkrtcy.D.Minn.1985); *In re Verco Industries,* 27 B.R. 615 (9th Cir. BAP 1982); *Lockheed Aircraft Corp. v. State Board of Equalization,* 81 Cal.App. 3d 257, 146 Cal.Rptr. 283 (1978).

15. The "stage of development" of an invention forms the factual basis for the legal conclusion of whether an invention has been "reduced to practice," a condition precedent to the application of the "on sale" and "public use" bar. *See Shatterproof Glass Corp., supra; Western Marine Electronics, Inc., supra.*

16. The evidence does not show that the inventions later patented were *complete,* i.e. reduced to practice, at the time of the alleged sales prior to the critical date. *See, e.g., Shatterproof Glass Corp., supra.*

17. Depending upon the type of the invention and its complexity, courts have determined whether there was a reduction to practice by looking to the stage of development of the invention, describing such inquiry through questions such as: whether the invention is "complete," *Western Marine Electronics, Inc., supra,* 764 F.2d at 845, and whether the invention has "passed beyond experiment" and has "attained certainty demonstrating the capacity of the invention to produce the desired result." *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1445 (Fed.Cir. 1984).

18. Reduction to practice of the claimed processes required that the methods consistently and reliably produce usable foams. Inventions defined by the independent claims of the '208 Patent and the '796 Patent did not reliably produce consistent foams until after the critical date.

19. Under 35 U.S.C. § 103, obviousness is a conclusion of law based upon certain factual determinations that are set forth in *Environmental Designs, Ltd. v. Union Oil Company of California,* 713 F.2d 693, 695 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984) (citations omitted):

> [T]hose fact determinations involve (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the pertinent art, and (4) additional evidence, which may serve as indicia of non-obviousness. As is or should be true of every performance of the judicial process, all relevant evidence on each dispositive issue must be fully considered and evaluated. When a patent is challenged on the ground that the claimed invention would have been obvious, all evidence relevant to the obvious-nonobvious issue must be considered.

20. Defendants have not separately addressed on this motion any of the four fact questions required for the obviousness determination. Defendant's suggestion to search the prior art for the "essence" of the claimed inventions is incorrect. *Panduit Corp. v. Dennison Mfg. Co.,* 774 F.2d 1082 (Fed.Cir.1985); Defendants' Memorandum of Points and Authorities In Opposition to the Preliminary Injunction Motion Re Patents. ("Defendants' Patent Memorandum") at p. 9.

21. The Court concludes that the NASA interim reports discussed at ¶¶ 98–100, *supra,* are not prior art under § 102. Such reports do not constitute "publications" under Section 102(b), because the public did not have reasonable, ready access to such interim reports. *Preemption Devices, Inc. v. Minnesota Mining & Manufacturing Co.,* 732 F.2d 903, 906 (Fed.Cir. 1984).

22. The evidence does not show that the patents are invalid under § 112 for violating the patent statute's best mode requirement. The patent disclosures are not "so poor as to effectively result in concealment." *DeGeorge v. Bernier,* 768 F.2d 1318, 1324 (Fed.Cir.1985), *citing In re Sherwood,* 613 F.2d 809, 816 (C.C.P.A. 1980).

23. This Court concludes that defendants have not established that the Court should exercise its discretion to grant them any intervening rights with respect to non-governmental sales which infringe the '796 patent. *See, e.g., Seattle Box Company, Inc. v. Industrial Crating & Packing, Inc.,* 756 F.2d 1574 (Fed.Cir.1985).

24. Because Imi–Tech has shown a likelihood of success of establishing at trial that defendants infringe the patent claims at issue on this motion in non-governmental sales and a likelihood of success on the issue of patent validity, and because Imi–Tech has shown that it is likely to suffer harm which is irreparable and which is not readily compensable in money, Imi–Tech has met the standard for issuance of a patent preliminary injunction.

25. Although the court finds that the balance of hardships tips sharply in favor of Imi–Tech, because the defendants may suffer harm if they are later found to have been wrongfully enjoined, an increase in the amount of the bond that currently secures the TRO is appropriate.

26. Any Conclusion of Law that is deemed in whole or in part to be a Finding of Fact is hereby designated as such.

THE COURT THEREFORE ORDERS THAT:

(1) The motion of plaintiff and counterclaim defendant Imi–Tech for a preliminary injunction regarding certain trade secrets and equitably owned patents be, and hereby is, GRANTED IN PART;

Pending the trial of the action or further order of the court,

(a) the defendants Chemtronics, Inc., John Gagliani, John Long, and all their respective agents, servants, employees and attorneys and those persons in active concert or participation with them, who receive actual notice of this preliminary injunction order by personal service or otherwise, be and hereby are enjoined from directly or indirectly licensing any of the U.S. patents listed on Exhibit A hereto, or any corresponding foreign patents and/or patent applications, to any person or entity;

(b) the defendants Chemtronics, Inc., and all their respective agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this preliminary injunction notice by personal service or otherwise, be and hereby are enjoined from directly or indirectly disclosing to any other person or entity, or authorizing or assisting in the practice by any other person or entity of, any of the trade secrets listed on Exhibit B.

(2) The motion of Imi–Tech for a Preliminary Injunction against infringement of claims 1–6 and 8–10 of the '208 Patent and claims 25–27 of the '796 Patent which are held by Imi–Tech be, and hereby is, GRANTED;

Pending the trial of the action or further order of the court, the defendants Chemtronics, Inc., John Gagliani, John Long, and all their respective agents, servants, employees and attorneys and those persons in active concert or participation with them, who receive actual notice of this preliminary injunction order by personal service or otherwise, be and hereby are enjoined from practicing the processes defined by claims 1–6 and 8–10 of the '208 Patent and claims 25–27 of the '796 Patent, except that the defendants, all their respective agents, servants, employees and attorneys and those persons in active concert or participation with them, are not enjoined from practicing the processes defined by the asserted claims of the '208 Patent and the '796 Patent in manufacturing products or performing research contracts "by or for the United States government" within the meaning of 28 U.S.C. § 1498.

(3) The plaintiff Imi–Tech shall give bond, in the amount of $100,000.00, for such costs and damages, if any, as may be found to have been suffered by the defendants if they are later found to have been wrongfully enjoined, by deposit of said amount into registry of court or by filing of an injunction bond, not later than Friday, April 18, 1986.

IT IS SO ORDERED.

EXHIBIT A

TO ORDER GRANTING IN PART
MOTION OF PLAINTIFF IMI–TECH CORPORATION
FOR A PRELIMINARY INJUNCTION RE TRADE SECRETS
UNITED STATES PATENTS APPLIED FOR BY GAGLIANI AND LONG
AFTER FEBRUARY 28, 1982 AND BEFORE FEBRUARY 28, 1983

| U.S. PATENT NO. | TITLE | APPLICATION DATE |
|---|---|---|
| 1. 4,407,980 | Closed Cell Polyimide Foams and Methods of Making Same | September 27, 1982 |
| 2. 4,425,441 | Closed Cell Polyimide Foams and Methods of Making Same | February 10, 1983 |
| 3. 4,433,068 | Process for Producing Bonded Macroballoon Structures and Resulting Product | February 17, 1983 |
| 4. Re. 31,756 Reissue of U.S. Patent No. 4,394,464 | Modified Polyimide Foams and Methods of Making Same | June 21, 1982 (Original) |

EXHIBIT B

TO ORDER GRANTING IN PART MOTION OF PLAINTIFF IMI–TECH CORPORATION FOR A PRELIMINARY INJUNCTION RE TRADE SECRETS

PLAINTIFF'S TRADE SECRETS

LIST OMITTED

APPENDIX, PAGE 1

### CLAIMS

26. A method of preparing a polyimide as defined in claim 25 in which the atomized droplets of diamine, ester solution are dried in a chamber having an inlet and an outlet for a heated gas and in which the inlet temperature of said gas in maintained in the range of 100°–110°C. and the outlet temperature thereof is limited to a maximum of 80°C.

[COLUMN SHOWING DEFENDANTS' PROCESSING PARAMETERS OMITTED]

27. A method of preparing a polyimide precursor as defined in claim 26 wherein the outlet temperature of said gas is controlled by regulating the rate of feed of the diamine, ester solution to the chamber in which said solution is dried.

2. A method of preparing a polyimide precursor as defined in claim 1 which the atomized droplets of diamine, ester solution are dried in a chamber having an inlet and an outlet for a heated gas and in which the inlet temperature of said gas in maintained in the range of 100°–100°C. and the outlet temperature is limited to a maximum of 80°C.

3. A method of preparing a polyimide precursor as defined in claim 1 wherein the outlet temperature of said gas is controlled by regulating the rate of feed of the diamine, ester solution to the chamber in which it is dried.

4. A method of preparing a polyimide precursor as defined in claim 1 wherein the gas with which the atomized droplets of the diamine, ester solution are dried is introduced into said chamber around, and in entraining relationship with, said droplets.

5. A method of preparing a polyimide precursor as defined in claim 1 wherein said diamine, ester solution is diluted with from 20 to 30 parts of alkyl alcohol per 100 parts of solution prior to atomizing said solution.

6. A method of preparing a polyimide precursor as defined in claim 1 wherein atomization of the diamine, ester solution is effected with a rotary type atomizer

and wherein the atomizer is operated at a speed in the range of 32,000 to 35,000 rpm.

8. A method of preparing a polyimide which includes the steps of making a precursor by a process as defined in any of the preceding claims 1–7 and converting the precursor to a polyimide by the application of heat.

9. A method of preparing a polyimide which includes the step of: forming a half ester of 3,3′, 4,4′-benzophenotetracarboxylic acid by reacting said acid or an anhydride thereof with a lower alkyl alcohol;

dissolving one or more primary diamines in the half ester, alcohol solution;

spray drying the material thus formed to convert it into a dry particulate polyimide precursor;

and converting the precursor to a polyimide by heating it.

10. A method of preparing a polyimide foam as defined in claim 9 in which the diamine, ester solution also includes a surface ac-

tive agent in an amount ranging from 0.01 to 1 percent based on the weight of the ester and diamine or diamines.